[No. H012004. Sixth Dist. May 3, 1995.]

JOSEPH C. MONTANA, JR., Plaintiff and Appellant, v.
SAN JOSE MERCURY NEWS, INC., Defendant and Respondent.

## COUNSEL

Mezzetti Law Firm and Robert L. Mezzetti II for Plaintiff and Appellant.

Pillsbury Madison & Sutro, Edward P. Davis, Jr., Kevin M. Fong, Judy Alexander and James M. Chadwick for Defendant and Respondent.

## OPINION

**COTTLE, P. J.**—On January 22, 1989, San Francisco 49'ers quarterback Joe Montana led his team to a 20-16 come-from-behind victory against the Cincinnati Bengals in Super Bowl XXIII. The following day, the San Jose Mercury News (SJMN) ran a front page story chronicling the 49'ers' feat and depicting four players, including Montana, celebrating on the field. The next year, the 49'ers were even more impressive in Super Bowl XXIV, sweeping past the Denver Broncos to a 55-10 win. Again, SJMN featured the 49'ers' accomplishment the next day in its front page story. The accompanying front page photograph showed Joe Montana "flying high in celebration with Guy McIntyre after a third-quarter touchdown pass to John Taylor."

The 1990 Super Bowl victory gave the 49'ers an unparalleled four championships in the 1980 to 1990 decade. To celebrate this accomplishment, SJMN issued a special "Souvenir Section" in its Sunday, February 4, 1990, edition, devoted exclusively to the 49'ers, a "team of destiny." The souvenir section, entitled "Trophy Hunters," carried an artist's rendition of Montana on the front page.

Each of these newspaper pages was reproduced in poster form within two weeks of its original printing in the newspaper and was made available for sale to the general public. Approximately 30 percent of the posters were sold for $5 each; SJMN gave away the remaining posters, mostly at charity events.

Almost two years after the last of these posters was produced, Montana brought an action against SJMN for common law and statutory (Civ. Code, § 3344) commercial misappropriation of his name, photograph, and likeness. SJMN moved for summary judgment, arguing that Montana's action was barred by the First Amendment and by the applicable statute of limitations. The trial court granted SJMN's motion on First Amendment grounds. From the subsequent judgment, Montana appeals. We shall affirm the judgment.

## DISCUSSION

Montana argues the court erred in granting summary judgment on his common law and statutory commercial misappropriation claims. For reasons we shall explain, we disagree.

■ A cause of action for common law misappropriation of a plaintiff's name or likeness may be pled by alleging: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. [Citations.]" (*Eastwood* v. *Superior Court* (1983) 149 Cal.App.3d 409, 417 [198 Cal.Rptr. 342].)

However, no cause of action will lie for the "[p]ublication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it . . . ." (*Dora* v. *Frontline Video Inc.* (1993) 15 Cal.App.4th 536, 542 [18 Cal.Rptr.2d 790]; see U.S. Const., art. I.) Furthermore, a matter in the public interest is not restricted to current events but may extend to the reproduction of past events. (*Ibid.*; *Carlisle* v. *Fawcett Publications, Inc.* (1962) 201 Cal.App.2d 733, 746 [20 Cal.Rptr. 405]; *Eastwood* v. *Superior Court, supra,* 149 Cal.App.3d at p. 421.)

In addition to the common law cause of action, California also has a statutory cause of action for misappropriation. (Civ. Code, § 3344.) The statutory cause of action *complements* rather than codifies common law misappropriation (*Lugosi* v. *Universal Pictures* (1979) 25 Cal.3d 813, 819 [160 Cal.Rptr. 323, 603 P.2d 425, 10 A.L.R.4th 1150]) and lies where the plaintiff can show that another "knowingly" used his or her "name, . . . photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without [the plaintiff's] prior consent . . . ." (Civ. Code, § 3344, subd. (a); *Eastwood* v. *Superior Court, supra,* 149 Cal.App.3d at pp. 416-417; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 589, pp. 687-688.)

Like the common law cause of action, the statutory cause of action specifically exempts from liability the use of a name or likeness in connection with the reporting of a matter in the public interest. Civil Code section

3344, subdivision (d) provides that no prior consent is required for "use of a name, . . . photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign . . . ." (Civ. Code, § 3344, subd. (d).)

*The Posters Reported on Newsworthy Events*

In the instant case, there can be no question that the full page newspaper accounts of Super Bowls XXIII and XXIV, and of the 49'ers' four championships in a single decade, constituted publication of matters in the public interest entitled to First Amendment protection. Montana, indeed, concedes as much. The question he raises in this appeal is whether the relatively contemporaneous reproduction of these pages, in poster form, for resale, is similarly entitled to First Amendment protection. We conclude that it is. This is because Montana's name and likeness appeared in the posters for *precisely* the same reason they appeared on the original newspaper front pages: because Montana was a major player in contemporaneous newsworthy sports events. Under these circumstances, Montana's claim that SJMN used his face and name solely to extract the commercial value from them fails.

Although we have been unable to locate any cases directly on point, several cases discuss First Amendment implications of the sale of posters, videotapes or movies of recognizable individuals without their consent. *Paulsen* v. *Personality Posters, Inc.* (1968) 59 Misc.2d 444 [299 N.Y.S.2d 501] is illustrative. There, comedian Pat Paulsen sought a preliminary injunction to bar a poster marketer from selling posters of him with the words "FOR PRESIDENT" written at the bottom. Paulsen had conducted a mock campaign for the presidency in 1968. In discussing whether Paulsen's statutorily defined "right of privacy" had been abridged, the court observed "that the statute was not intended to limit activities involving the dissemination of news or information concerning matters of public interest . . . . [S]uch activities are privileged and do not fall within 'the purposes of trade' contemplated by Section 51 [New York's equivalent of California Civil Code section 3344], notwithstanding that they are also carried on for a profit [citations]. Thus, it was early held that newspapers, magazines, and newsreels are exempt from the statutory injunction when using a name or picture in connection with an item of news or one that is newsworthy and such privileged status has also been extended to other communications media including books, comic books, radio, television and motion pictures. [Citations.] Indeed, it is clear that any format of 'the written word or picture', including posters and handbills [citation] will be similarly exempted in conjunction with the dissemination of news or public interest presentations [citation]." (*Id.* at p. 506.)

Applying those principles to the poster of Paulsen, the court stated: "When a well-known entertainer enters the presidential ring, tongue in cheek

or otherwise, it is clearly newsworthy and of public interest. A poster which portrays plaintiff in that role, and reflects the spirit in which he approaches said role, is a form of public interest presentation to which protection must be extended." (*Paulsen* v. *Personality Posters, Inc., supra,* 299 N.Y.S.2d at p. 507.)[1]

The same could be said here. When Joe Montana led his team to four Super Bowl championships in a single decade, it was clearly a newsworthy event. Posters portraying the 49'ers' victories are, like the poster in *Paulsen,* a "form of public interest presentation to which protection must be extended." (299 N.Y.S.2d at p. 507.)

A similar conclusion was reached in *Jackson* v. *MPI Home Video* (N.D.Ill. 1988) 694 F.Supp. 483. In that case, the Reverend Jesse Jackson sought an injunction against the unauthorized distribution of videocassettes of a copyrighted speech he gave at the 1988 Democratic National Convention. The court granted the injunction based on Jackson's copyright claims. At the same time, it noted that Jackson's "chances of success on [his] right to publicity claim appear less than negligible" as the "defendants[] claim[ed] that they were engaged in news reporting . . . ." (*Id.* at p. 492.) The court explained that the right of publicity "is based upon the plaintiff's right to use his own name and likeness for his own benefit, and this right is violated when one, without leave, uses it for his benefit and not the plaintiff's. [Citations.] Public figures possess this right with respect to commercial use of their names and likeness. [Citation.] But public figures do not retain the right of publicity against the use of name and likeness in the news media. [Citation.]" (*Ibid.*)

And in *Dora* v. *Frontline Video, Inc., supra,* 15 Cal.App.4th at page 536, a self-proclaimed surfing "legend" sued the producer of a video documentary on surfing claiming common law and statutory appropriation of his name and likeness. The trial court entered summary judgment for the film's producer, and the Court of Appeal affirmed, finding that the documentary contained matters of public interest and was therefore protected by the First Amendment. The court further held that the statutory exemption from liability for "public affairs" (Civ. Code, § 3344, subd. (d)) applied to surfing, which "is of more than passing interest to some. It has created a life-style that influences speech, behavior, dress, and entertainment, among other things. A phenomenon of such scope has an economic impact, because it affects purchases, travel, and the housing market. Surfing has also had a

[1]Compare *Factors Etc., Inc.* v. *Pro Arts, Inc.* (2d Cir. 1978) 579 F.2d 215, finding that a poster of Elvis Presley published after his death was not protected by the First Amendment. The holding in that case was later reversed on other grounds. (*Factors Etc., Inc.* v. *Pro Arts, Inc.* (2d Cir. 1981) 652 F.2d 278.)

significant influence on the popular culture, and in that way touches many people." (15 Cal.App.4th at p. 546.) Again, the same public interest considerations applicable to surfing apply with equal force to professional football.

*A Newspaper Has a Constitutional Right to Promote Itself by Reproducing Its News Stories*

Additionally, SJMN had a right to republish its front page sports stories to show the quality of its work product. It is well established that "a person's photograph originally published in one issue of a periodical as a newsworthy subject (and therefore concededly exempt from the statutory prohibitions) may be republished subsequently in another medium as an advertisement for the periodical itself, illustrating the quality and content of the periodical, without the person's written consent." (*Booth* v. *Curtis Publishing Company* (1962) 15 A.D.2d 343 [223 N.Y.S.2d 737, 738-739].) In the *Booth* case, the court held that actress Shirley Booth's right of publicity was not abridged by the publication of her photograph from an earlier edition of Holiday magazine in a later edition advertising the periodical.

This same rule was applied in *Cher* v. *Forum Intern., Ltd.* (9th Cir. 1982) 692 F.2d 634. In that case, actress/singer Cher had been interviewed by a talk show host in connection with a planned cover story on her in Us magazine. However, Cher and the magazine had a falling out, and plans for the story were dropped. The interviewer then sold the Cher interview to the publishers of Star, a tabloid, and Forum, a magazine. Cher sued, saying that her reputation was "degraded by the suggestion that she would give an exclusive interview to [those] publication[s]." (*Id.* at p. 637.) Advertisements about Cher's interview in Forum appeared in Star, Penthouse, Forum, and the New York Daily News, falsely stating that Cher would divulge secrets to Forum that she " 'won't tell People and would never tell Us.' " (*Id.* at p. 638.)

Applying California law, the court held that the publication of the interview in Forum was protected by the First Amendment. The Ninth Circuit court pointed out that the California Supreme "Court has acknowledged that 'the right of publicity has not been held to outweigh the value of free expression. Any other conclusion would allow reports and commentaries on the thoughts and conduct of public and prominent persons to be subject to censorship under the guise of preventing the dissipation of the publicity value of a person's identity.' " (692 F.2d at p. 638, citing *Guglielmi* v. *Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 873 [160 Cal.Rptr. 352, 603 P.2d 454] (conc. opn. of Bird, J.).)

The court noted that although "California law permits recovery for the unauthorized use of one's likeness or name for commercial purposes [citations][,] [n]o action under this theory will lie . . . solely for publication which is protected by the First Amendment. [¶] Constitutional protection extends to the truthful use of a public figure's name and likeness in advertising which is merely an adjunct of the protected publication and promotes only the protected publication. [Citation.] Advertising to promote a news medium, accordingly, is not actionable under an appropriation of publicity theory so long as the advertising does not falsely claim that the public figure endorses that news medium." (*Cher* v. *Forum Intern., Ltd.*, *supra*, 692 F.2d at p. 639; see also *Namath* v. *Sports Illustrated* (1975) 48 A.D.2d 487 [371 N.Y.S.2d 10] [no violation of right of privacy where photo of Namath from 1969 Super Bowl game, which had originally appeared in Sports Illustrated, was used in advertisements for Sports Illustrated in Cosmopolitan (with the heading, *The Man You Love [L]oves Joe Namath*) and in Life (with the heading, *How to get Close to Joe Namath*)].)

At the hearing on the summary judgment motion in this case, SJMN submitted undisputed evidence that it sold the posters to advertise the quality and content of its newspaper. The posters were effective in this regard: they were exact reproductions of pages from the paper. They contained no additional information not included on the newspaper pages themselves, and they did not state or imply that Montana endorsed the newspaper. SJMN also submitted evidence showing it set the price of the posters with the intent simply to recover its costs.[2] Where, as here, a newspaper page covering newsworthy events is reproduced for the purpose of showing the quality and content of the newspaper, the subsequent reproduction is exempt from the statutory and common law prohibitions.

In summary, the First Amendment protects the posters complained about here for two distinct reasons: first, because the posters themselves report newsworthy items of public interest, and second, because a newspaper has a constitutional right to promote itself by reproducing its originally protected articles or photographs. Our conclusion on the First Amendment makes it unnecessary to discuss the alternative basis for upholding the judgment, the claim that the applicable statute of limitations bars recovery.

---

[2]The fact that the posters were sold is without significance. "The First Amendment is not limited to those who publish without charge. Whether the activity involves newspaper publication or motion picture production, it does not lose its constitutional protection because it is undertaken for profit." (*Guglielmi* v. *Spelling-Goldberg Productions, supra*, 25 Cal.3d at p. 868.) "That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment." (*Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 501-502 [96 L.Ed. 1098, 1105-1106, 72 S.Ct. 777].)

*Attorney Fees on Appeal*

 As the prevailing party in the trial court, SJMN sought and obtained an award of attorney fees pursuant to Civil Code section 3344, subdivision (a), which provides, in pertinent part: "The prevailing party in any action under this section shall also be entitled to attorney's fees and costs." SJMN now seeks to recover its attorney fees incurred in responding to Montana's appeal.

It is well settled "that fees, if recoverable at all—pursuant either to statute or parties' agreement—are available for services at trial and on appeal." (*Serrano* v. *Unruh* (1982) 32 Cal.3d 621, 637 [186 Cal.Rptr. 754, 652 P.2d 985].) Since attorney fees were expressly recoverable here pursuant to Civil Code section 3344, subdivision (a), SJMN is entitled to recover its attorney fees on appeal to be determined in the trial court.

## DISPOSITION

The judgment is affirmed. SJMN shall recover its costs and attorney fees on appeal.

Wunderlich, J., and Mihara, J., concurred.

On May 30, 1995, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 17, 1995. Lucas, C. J., was of the opinion that the petition should be granted.