**PUBLISH**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

_____

No. 96-6809

_____

D. C. Docket No. CV95-P-1555-S

ELISA ALLISON, individually and as the
executrix of the Estate of Clifford
Allison; OREL HERSHISHER

Plaintiffs-Appellants,

versus

VINTAGE SPORTS PLAQUES,

Defendant,

HMA INVESTMENTS, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(March 18, 1998)**

Before TJOFLAT and HULL, Circuit Judges, and KRAVITCH, Senior
Circuit Judge.

KRAVITCH, Senior Circuit Judge:

The issue presented in this case is whether the "first-sale

doctrine," a well-established limitation on intellectual property rights, applies to the common-law right of publicity. We hold that it does. Accordingly, we affirm the district court, which granted summary judgment to the defendant.

## I.

Elisa Allison ("Allison") is the widow of Clifford Allison, a well-known race-car driver who had a licensing agreement with Maxx Race Cards ("MAXX") whereby Maxx would manufacture and market trading cards bearing his likeness in exchange for a royalty of 18% of sales receipts, which is now paid to his estate. Orel Hershisher ("Hershisher") is a well-known professional baseball player who has a licensing agreement with the Major League Baseball Players Association ("MLBPA") that grants MLBPA the right to use and license his name and image for commercial purposes in exchange for a pro rata share of all revenues derived therefrom. MLBPA has licensed Hershisher's name and image to various trading card companies, which have manufactured and marketed cards bearing his image.

Vintage Sports Plaques ("Vintage") purchases trading cards from licensed card manufacturers and distributors and, without altering the cards in any way, frames them by mounting individual cards between a transparent acrylic sheet and a wood board. Vintage then labels each plaque with an identification plate

2

bearing the name of the player or team represented.  In addition to the mounted trading card, some of the plaques feature a clock with a sports motif.  Vintage markets each plaque as a "Limited Edition" and an "Authentic Collectible." Vintage is not a party to any licensing agreement that grants it the right to use the appellants' names or likenesses for commercial purposes and has never paid a royalty or commission to the appellants for its use of their names or images.  Appellants presumably have received, however, pursuant to their respective licensing agreements, royalties from the card manufacturers and distributors for the <u>initial</u> sale of the cards to Vintage.

Allison filed suit against Vintage in Alabama state court alleging infringement of licensure rights, violation of the right of publicity, and conspiracy,[1] and Vintage removed the action to the United States District Court for the Northern District of Alabama on the basis of diversity of citizenship.  Allison then filed an amended complaint seeking to join Hershisher as a plaintiff and to certify a plaintiff class.  The amended complaint alleged violation of the right of publicity and conspiracy and included a prayer for injunctive and declaratory relief.  Vintage moved for summary judgment, and the district court, concluding that "it would be provident to consider [the motion] to determine if a

---

[1] The named defendants were Vintage and HMA Investments, which does business as Vintage.

3

legally cognizable claim is stated in the amended complaint . . .
[b]efore considering the issue of class certification,"[2] granted
the motion.  The district court first decided that although
appellants established a prima facie case of violation of the right
of publicity, the first-sale doctrine operates as a defense in such
actions.  The district court then concluded that because "[t]his is
more appropriately classified as a case of an entrepreneur
repackaging or displaying the trading cards in a more attractive
way to consumers,"[3] rather than a case of an opportunist "using
Plaintiffs' names and likenesses to sell frames and clocks,"[4]
Vintage was entitled to summary judgment on the right of publicity
claim.[5]

II.

We review grants of summary judgment de novo, applying the
same legal standard as the district court.  See Gordon v. Cochran,
116 F.3d 1438, 1439 (11th Cir. 1997).  Summary judgment is
appropriate if, after examining the entire record, the court

---

[2]  Order Granting Summary Judgment ("Order") at 1.

[3]  Id. at 7.

[4]  Id. at 5.

[5]  Id. at 8-9.  The district court also granted summary judgment
on the conspiracy claim because the only parties originally named
by appellants in the complaint — HMA Investments and Vintage —
were a single entity and thus were incapable of conspiracy.
Appellants have not appealed this decision.

4

concludes that there is no genuine issue of material fact. <u>See</u>

Fed. R. Civ. P. 56(c).


A.

As a preliminary matter, we note that as a court sitting in

diversity we are bound to apply state substantive law. <u>See</u> <u>Erie</u>

<u>R.R. Co. v. Tompkins</u>, 304 U.S. 64, 58 S. Ct. 817 (1938). In

reaching its conclusions, the district court purported to apply

Alabama law, and we do the same.[6] The district court cited only one

---

[6] The district court did not address choice of law in its Order, but rather seemed to assume that Alabama law applied. A district court must apply the choice-of-law rules of the state in which it sits. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 61 S. Ct. 1020 (1941). Alabama uses a vested rights approach in determining the applicable law in tort actions, an approach that ordinarily results in application of the law of the state where the injury occurred. <u>See</u> <u>Fitts v. Minn. Mining & Mfg. Co.</u>, 581 So.2d 819, 820 (Ala. 1991) ("<u>Lex</u> <u>loci</u> <u>delicti</u> has been the rule in Alabama for almost 100 years. Under this principle, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred."); <u>accord</u> <u>Etheredge v. Genie Indus., Inc.</u>, 632 So.2d 1324, 1325 (Ala. 1994). Because Alabama courts have not addressed choice-of-law issues in cases similar to the one before us, whether denominated as right of publicity actions or commercial appropriation invasion of privacy actions, <u>see</u> <u>infra</u>, it is difficult to determine what choice-of-law principles an Alabama state court would apply in this case. For example, it is not clear whether the locus of the injury would be the location of the plaintiff or instead the situs of the allegedly tortious conduct. To complicate matters, the right of publicity has been treated in some jurisdictions as a property right, and some courts accordingly have used choice-of-law rules applicable to personal property. <u>See</u> <u>Acme Circus Operating Co., Inc., v. Kuperstock</u>, 711 F.2d 1538, 1541 (11th Cir. 1983) (applying California choice-of-law principles to determine "whether or not an intangible personal property right, the right of publicity, survives the death of the individual in whom the right arose"); <u>see</u>

5

Alabama case, <u>Birmingham Broadcasting Co. v. Bell</u>, 68 So.2d 314

(Ala. 1953), for the proposition that Alabama has recognized a

cause of action for violation of the right of publicity. In <u>Bell</u>,

the court held that the only cause of action available to a well-

known radio announcer against a broadcaster who had used the

announcer's name without his permission was for "violation of his

privacy." <u>Id.</u> at 319. Noting that the earlier case of <u>Smith v.</u>

<u>Doss</u>, 37 So.2d 118 (Ala. 1948), impliedly had recognized a cause of

action for violation of the right of privacy, the court held that

the "privacy of a public personage may not be lawfully invaded by

the use of his name or picture for commercial purposes without his

consent, not incidental to an occurrence of legitimate news value."

<u>Bell</u>, 68 So.2d at 319. Although it does not appear that Alabama

courts ever have recognized a right denominated as "publicity," we

conclude that the Alabama right of privacy contains an analogous

right.

Alabama, like most states, has recognized that

[T]he invasion of privacy tort consists of four distinct
wrongs: 1) the intrusion upon the plaintiff's physical
solitude or seclusion; 2) publicity which violates the
ordinary decencies; 3) putting the plaintiff in a false, but
not necessarily defamatory, position in the public eye; and 4)

generally J. Thomas McCarthy, <u>The Rights of Publicity and Privacy</u>
§ 11.3 (1997). Because Allison resides in Alabama, treatment of
right of publicity claims as property actions likely would result
in application of Alabama substantive law. Although there are
certain ambiguities, we nevertheless conclude that an Alabama court
would apply Alabama law to resolve this case.

the appropriation of some element of the plaintiff's personality for a commercial use.

Phillips v. Smalley Maintenance Services, Inc., 435 So.2d 705, 708 (Ala. 1983); cf. Smith, 37 So.2d at 120 (defining the common-law right of privacy as "the right of a person to be free from unwarranted publicity or the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities"). Alabama has recognized the commercial appropriation invasion of privacy tort, although the cause of action has been addressed directly by Alabama's highest court only twice. See Schifano v. Greene County Greyhound Park, Inc., 624 So.2d 178 (Ala. 1993); Bell, supra. In Schifano, the Alabama Supreme Court held that the plaintiffs, who were depicted in a group photograph that appeared without their consent in an advertisement created by the defendant, could not prevail on a claim of commercial misappropriation of their likenesses. Quoting the Restatement (Second) of Torts § 652C, the court noted that "[i]t is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded." Schifano, 624 So.2d at 181. Because there

7

was "no unique quality or value in the [plaintiffs'] likenesses that would result in commercial profit to the [defendant] simply from using a photograph that included them," id., the court concluded that the plaintiffs could not prevail.  See also Kyser-Smith v. Upscale Communications, Inc., 873 F. Supp. 1519, 1525-27 (M.D. Ala. 1995) (denying summary judgment to defendant on commercial appropriation claim under Alabama law because plaintiff established genuine issue of the value of her likeness and of the defendant's commercial benefit from the exploitation of that likeness); cf. J.C. v. WALA-TV, Inc, 675 So.2d 360 (Ala. 1996)(recognizing "legitimate news interests exception" to commercial appropriation tort liability); Doe v. Roe, 638 So.2d 826 (Ala. 1994) (same).

The commercial appropriation right of privacy is similar, but not identical, to the right of publicity recognized in a number of jurisdictions.  Whereas judicial acceptance of the four distinct torts that comprise the general right of privacy is "universal," J. Thomas McCarthy, The Rights of Publicity and Privacy § 1.5[E] (1997), the right of publicity has been recognized in only sixteen states, id. at § 6.1[B].  One commentator has summarized the difference between the right of publicity and the commercial-appropriation prong of the right of privacy this way:

> The appropriation type of invasion of privacy, like all privacy rights, centers on damage to human dignity.  Damages are usually measured by "mental distress" — some bruising of

8

the human psyche.  On the other hand, the right of publicity relates to commercial damage to the business value of human identity.  Put simplistically, while infringement of the right of publicity looks to an injury to the pocketbook, an invasion of appropriation privacy looks to an injury to the psyche.

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 28:6 (1997); see Haelan Lab., Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866, 868 (2d Cir. 1953) ("[M]any prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains, and subways.").

Alabama has not denominated the interest protected by its commercial appropriation invasion of privacy tort as the right of publicity.  See McCarthy, Rights of Privacy and Publicity at § 6.1[B] (noting that sixteen states judicially or statutorily have recognized the right of publicity, denominated as such, and that an additional nine states have statutes that cover most aspects of the right of publicity).  We read Alabama's commercial appropriation privacy right, however, to represent the same interests and address the same harms as does the right of publicity as customarily defined. Indeed, the elements of Alabama's commercial appropriation invasion of privacy tort, which bases liability on commercial, rather than psychological, interests, cf. McCarthy, McCarthy on

9

<u>Trademarks and Unfair Competition</u> § 28:6, do not differ significantly from those of the tort of violation of the right of publicity. <u>Compare</u> <u>Kyser-Smith v. Upscale Communications, Inc.</u>, 873 F. Supp. 1519, 1525-27 (M.D. Ala. 1995), <u>with</u> <u>Montana v. San Jose Mercury News, Inc.</u>, 34 Cal. App. 4th 790, 793, 40 Cal. Rptr. 2d 639, 640 (Cal. Ct. App. 1995). As a technical matter, then, we construe appellants' claim as one sounding in commercial appropriation, rather than in publicity, although we conclude that the distinction is largely semantic.[7]

Although the Alabama Supreme Court has addressed the tort of commercial appropriation only twice and thus has provided us with little guidance in determining the contours of the cause of action, we read Alabama law to permit a cause of action for invasion of privacy when the defendant appropriates without consent the "plaintiff's name or likeness to advertise the defendant's business or product, or for some other similar commercial purpose." <u>Kyser-Smith</u>, 873 F. Supp. at 1525. The plaintiff must demonstrate that there is a "unique quality or value in [his] likeness[]" that, if appropriated, would result in "commercial profit" to the defendant. <u>Schifano</u>, 624 So.2d at 181; <u>cf.</u> <u>Montana v. San Jose Mercury News, Inc.</u>, 34 Cal. App. 4th 790, 793, 40 Cal. Rptr. 2d 639, 640 (Cal. Ct.

---

[7] Because we conclude that there is no significant difference between Alabama's commercial appropriation privacy tort and the right of publicity, we use the terms interchangeably during the remainder of the opinion.

10

App. 1995) ("A cause of action for common law misappropriation of a plaintiff's name or likeness may be pled by alleging: (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.") (internal quotation omitted).

## B.

The district court concluded that the first-sale doctrine precludes appellants from holding Vintage liable in tort. The first-sale doctrine provides that once the holder of an intellectual property right "consents to the sale of particular copies . . . of his work, he may not thereafter exercise the distribution right with respect to such copies . . . ." M. Nimmer and D. Nimmer, Nimmer on Copyright § 8.12[B][1] (1997). Any other rule would extend the monopoly created by the intellectual property right so far as to permit control by the right-holder over the disposition of lawfully obtained tangible personal property. Therefore, "the policy favoring [an intellectual property right monopoly] . . . gives way to the policy opposing restraints of trade and restraints on alienation." Id. at § 8.12[A]. The first-sale doctrine limits the three principal forms of intellectual property rights: (1) copyright, see 17 U.S.C. § 109(a) ("[T]he owner of a particular copy or phonorecord lawfully made under this

11

title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."); (2) patent, see Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993) ("The law is well settled that an authorized sale of a patented product places that product beyond the reach of the patent. The patent owner's rights with respect to the product end with its sale, and a purchaser of such a product may use or resell the product free of the patent.") (internal cites omitted); and (3) trademark, see NEC Elec. v. Cal Circuit ABCO, 810 F.2d 1506, 1509 (9th Cir. 1987) ("Once a trademark owner sells his product, the buyer ordinarily may resell the product under the original mark without incurring any trademark liability.") (citing Prestonettes, Inc. v. Coty, 264 U.S. 359, 368-69, 44 S. Ct. 350, 351-52 (1924)).

Appellants argue that we should not apply the first-sale doctrine to common-law actions to enforce the right of publicity. There is virtually no case law in any state addressing the application of the first-sale doctrine to the right of publicity, perhaps because the applicability of the doctrine is taken for granted.[8] The cases cited by appellants do not show that the

---

[8] We note that some states that statutorily have recognized a right of publicity have codified the first-sale doctrine. See, e.g., Fla. Stat. Ann. § 540.08(3)(b) ("The provision of this section [protecting a right of privacy] shall not apply to: . . . The use of such name, portrait, photograph, or other likeness in connection with the resale or other distribution of literary,

12

doctrine is inapplicable to publicity actions, but rather address instances either of unauthorized use of likenesses that never have been licensed for use, see, e.g., Genesis Publications, Inc. v. Goss, 437 So.2d 169 (Fla. Dist. Ct. App. 1983), cert. denied, 449 So.2d 264 (Fla. 1984) (upholding jury verdict for plaintiff who, although consenting to be the subject of a photograph, never authorized use of that photograph); Brinkley v. Casablancas, 438 N.Y.S.2d 1004 (N.Y. App. Div. 1981) (same), or of use by a licensee that exceeds the scope of the license, see, e.g., Zim v. Western Pub. Co., 573 F.2d 1318, 1327 (holding that publisher's contract with author allowed use of author's name on one book, but did not permit such use on another book, rendering the latter use tortious).

Appellants argue that the right of publicity differs from other forms of intellectual property because the former protects "identity," whereas the latter protect "a particular photograph or product."[9] The first-sale doctrine should not apply, they reason, because a celebrity's identity continues to travel with the tangible property in which it is embodied after the first sale. We find two significant problems with appellants' argument. First,

---

musical, or artistic productions or other articles of merchandise or property whether such person has consented to the use of his or her name, portrait, photograph, or likeness on or in connection with the initial sale or distribution thereof . . . .").

[9] Allison Br. at 10.

13

the distinction that appellants draw between what is protected by the right of publicity and what is protected by other forms of intellectual property rights, such as copyright, is not sound. Copyright law, for example, does not exist merely to protect the tangible items, such as books and paintings, in which the underlying expressive material is embodied; rather, it protects as well the author's or artist's <u>particular</u> expression that is included in the tangible item. The copyright law thus would be violated not only by directly photocopying a protected work, but also by publishing language or images that are substantially similar to that contained in the copyrighted work. <u>See</u> <u>Warren Publ'g, Inc. v. Microdos Data Corp.</u>, 115 F.3d 1509, 1516 n.19 (11th Cir. 1997) ("The test for infringement of copyrighted works is one of 'substantial similarity.'").

Second, and more important in our view, accepting appellants' argument would have profoundly negative effects on numerous industries and would grant a monopoly to celebrities over their identities that would upset the delicate "balance between the interests of the celebrity and those of the public." <u>White v. Samsung Elec. Am., Inc.</u>, 989 F.2d 1512, 1515 (9th Cir. 1993) (Kozinski, J., dissenting from the order rejecting the suggestion for rehearing en banc). Indeed, a decision by this court not to apply the first-sale doctrine to right of publicity actions would render tortious the resale of sports trading cards and memorabilia

14

and thus would have a profound effect on the market for trading cards, which now supports a multi-billion dollar industry. See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 868 F. Supp. 1266, 1274 n.6 (N.D. Okla. 1994) ("The trading card market is now a $2.007 billion industry."), aff'd, 95 F.3d 959 (10th Cir. 1996); McCarthy, Rights of Privacy and Publicity at § 7.7[E]; cf. Major League Baseball Players Ass'n v. Dad's Kids Corp., 806 F. Supp. 458, 460 (S.D.N.Y. 1992) ("The fact that an enormous secondary market exists for baseball cards and baseball card derivative works leads me to conclude on this record that baseball players have little if any continuing publicity rights with respect to the use and reuse of their pictures on cards by subsequent purchasers and sellers of duly licensed baseball cards following a perfectly proper first sale into commerce for which the players get a royalty."), transferred sub nom. In re Dad's Kids Corp., (C.D. Cal. June 30, 1994). Such a holding presumably also would prevent, for example, framing a magazine advertisement that bears the image of a celebrity and reselling it as a collector's item, reselling an empty cereal box that bears a celebrity's endorsement, or even reselling a used poster promoting a professional sports team. Refusing to apply the first-sale doctrine to the right of publicity also presumably would prevent a child from selling to his friend a

baseball card that he had purchased, a consequence that undoubtedly would be contrary to the policies supporting that right.

A holding that the first-sale doctrine does limit the right of publicity, on the other hand, would not eliminate completely a celebrity's control over the use of her name or image; the right of publicity protects against unauthorized use of an image, and a celebrity would continue to enjoy the right to license the use of her image <u>in the first instance</u> -- and thus enjoy the power to determine when, or if, her image will be distributed. Appellants in this case, for example, have received sizable royalties from the use of their images on the trading cards at issue,[10] images that could not have been used in the first place without permission. Because application of the first-sale doctrine to limit the right of publicity under Alabama law will maintain the appropriate balance between the rights of celebrities in their identities and the rights of the public to enjoy those identities, we conclude that the Alabama Supreme Court would apply the first-sale doctrine in this case and that the district court properly so applied it.[11]

---

[10] During the period from 1993 to 1996, Hershisher alone received over $230,000 in royalties from licensing and endorsements. <u>See</u> R2-24-Tab 2-2.

[11] Appellants' argument that Vintage acted tortiously because appellants' licensing arrangements do not authorize Vintage (or any other third party) to market or appropriate their likenesses lacks merit in light of our conclusion that the first-sale doctrine

C.

Having concluded that the first-sale doctrine applies to limit the right of publicity under Alabama law, we turn to the question of whether the district court correctly granted summary judgment in favor of Vintage. Appellants cannot prevail under a commercial appropriation cause of action if Vintage merely resells the trading cards that bear appellants' likenesses because the resale of licensed images falls under the protective scope of the first-sale doctrine.

> The district court correctly observed:

> Vintage would probably violate the right of publicity if [it] attached a trading card to a baseball glove and sold it as "an official Orel Hershisher glove" or if [it] affixed a Clifford Allison card onto a model car and sold it as "an official Clifford Allison car." Thus, this court must decide if the Vintage Clocks and plaques are more like reselling the trading cards or more like using Plaintiffs' names and likenesses to sell frames and clocks, similar to selling an Allison car or a Hershisher glove.[12]

Because the district court concluded that "Vintage is selling the trading cards after presenting them in, what some consumers deem to

---

applies to the right of publicity. Because the first-sale doctrine limits appellants' rights in controlling the use of their likenesses, Vintage (or any other third party) lawfully could sell or transfer the tangible property containing appellants' licensed images without separately entering a licensing agreement with appellants.

[12] Order at 5.

be, a more attractive display,"[13] and because the first-sale doctrine permits such resale, the court granted summary judgment on the right of publicity claim. Appellants contend that the issue of whether Vintage's plaques are "more like reselling the trading cards or more like using Plaintiffs' names and likenesses to sell frames and clocks"[14] involves questions of material fact that should not have been resolved at the summary judgment stage.

The issue before us, then, is whether the district court properly resolved as a matter of law that Vintage's plaques merely are the cards themselves repackaged, rather than products separate and distinct from the trading cards they incorporate. If they are the latter, as appellants contend that they are, then arguably Vintage is selling a product by "commercially exploiting the likeness[es of appellants] intending to engender profits to their enterprise," Wendt v. Host Int'l, Inc., 125 F.3d 806, 811 (9th Cir. 1997), a practice against which the right of publicity seems clearly to protect.

Appellants cite inapposite cases to support their claim that the district court resolved a fact question that should have been left to the jury. In Wendt, the plaintiffs claimed that robotic figures used in the defendant's display bore their likenesses and

---

[13]  Id. at 8.

[14]  Id. at 5.

18

thus that the defendant improperly appropriated their images for commercial purposes. The district court granted summary judgment in favor of the defendant, but the court of appeals reversed, holding that because "[a]ppellants have raised genuine issues of material fact concerning the degree to which the figures look like them," they "have also raised triable issues of fact as to whether or not appellees sought to appropriate their likenesses for their own advantage . . . ." Wendt, 125 F.3d at 811. The court had no occasion to address the first-sale doctrine because the plaintiffs never had authorized use of their images; because they had created genuine issues of material fact for all other elements of a cause of action for right of publicity, the court denied summary judgment on the ground that the appellants demonstrated a genuine issue as to whether the defendant actually had used the plaintiff's identity. In the case before us, by contrast, there is no dispute that the images used by Vintage in its displays are those of the appellants; in addition, unlike Wendt, the appellants here have licensed the use and distribution of the images at the center of the controversy. The other cases cited by appellants are similarly inapposite. See Abdul-Jabbar v. General Motors Corp., 85 F.3d 407, 416 (9th Cir. 1996) (concluding that "[w]hether or not Lew Alcindor 'equals' Kareem Abdul-Jabbar . . . is a question for the jury"); White v. Samsung Elec. Am., Inc., 971 F.2d 1395, 1399 (9th Cir. 1992) (reversing summary judgment for defendant because plaintiff

19

created genuine issue whether robot that reminded viewers of plaintiff in defendant's advertisement amounted to appropriation of plaintiff's identity).

We conclude that the district court properly determined that, as a matter of law, Vintage merely resells cards that it lawfully obtains. Cf. Beal v. Paramount Pictures Corp., 20 F.3d 454, 456, 459 (11th Cir. 1994) (stating that "[w]hen called upon to adjudicate a copyright dispute, a court must compare the works in question," and noting that although copyright disputes are "inherent[ly] subjectiv[e]," "courts have been willing to grant summary judgment in infringement cases when it is clear that the moving party is entitled to judgment as a matter of law"). We think it unlikely that anyone would purchase one of Vintage's plaques for any reason other than to obtain a display of the mounted cards themselves. Although we recognize that the plaques that include a clock pose a closer case, we conclude that it is unlikely that anyone would purchase one of the clock plaques simply to obtain a means of telling time, believing the clock to be, for example, a "Hershisher Clock" or an "Allison Clock."[15] Because reselling a product that was lawfully obtained does not give rise to a cause of action for violation of the right of publicity, we hold that the district

---

[15] Appellants make much of the fact that Vintage markets its plaques as "Limited Edition[s]" and "Authentic Collectible[s]." In our view, however, these designations in no way change the fundamental nature of the plaques.

court correctly entered summary judgment in favor of Vintage on the right of publicity claim.[16]

## III.

The judgment of the district court in favor of appellee is AFFIRMED.

---

[16] Appellants also argue that Vintage violated their right of publicity merely by using the appellants' names on the plaques. Although appellants are correct that unauthorized use of a celebrity's <u>name</u>, in contrast to a celebrity's image, to promote a product ordinarily constitutes a violation of the right of publicity, <u>see, e.g.</u>, <u>Acme Circus Operating Co., Inc. v. Kuperstock</u>, 711 F.2d 1538 (11th Cir. 1983) (recognizing that under California law, unauthorized use of celebrity's name to endorse product can violate right of publicity), it does not violate the right of publicity to use the celebrity's name to identify the likeness if the <u>image</u> is lawfully used, <u>see</u> <u>Zim v. Western Publishing Co.</u>, 573 F.2d 1318, 1327 (5th Cir. 1978) (holding that authorization to publish author's work provided implicit authorization to use author's name on spine of book, thus defeating commercial appropriation claim under Florida law).
Appellants' argument about the use of their names thus rises and falls with their arguments about the applicability of the first-sale doctrine and the nature of the product that Vintage sells. Because we conclude that the first-sale doctrine applies and that Vintage's displays merely repackage the trading cards, Vintage's use of appellants' names to label the displays does not violate their common-law right of publicity.