[No. A122452. First Dist., Div. One. Jan. 28, 2010.]

JAMES STEWART et al., Plaintiffs and Respondents, v.
ROLLING STONE LLC et al., Defendants and Appellants.

COUNSEL

Davis Wright Tremaine, Elizabeth A. McNamara, Thomas R. Burke and Rochelle L. Wilcox for Defendants and Appellants.

Horvitz & Levy, John A. Taylor, Jr., Jeremy B. Rosen for American Media, Inc., Association of Alternative Newsweeklies, California First Amendment Coalition, California Newspaper Publishers Association, Magazine Publishers of America, Inc., The Reporters Committee for Freedom of the Press and Time Inc., as Amici Curiae on behalf of Defendants and Appellants.

Bartko, Zankel, Tarrant & Miller, Christopher J. Hunt and Gisu Sadaghiani for Plaintiffs and Respondents.

OPINION

**DONDERO, J.**—Defendants Rolling Stone LLC and Wenner Media LLC appeal from an order denying their special motion to strike a class action complaint under Code of Civil Procedure section 425.16 (hereafter section 425.16).[1] Section 425.16 sets out a procedure for striking complaints in lawsuits that are commonly known as SLAPP suits (strategic lawsuits against public participation). Defendants contend the trial court erred in concluding that a triable issue exists as to whether the editorial feature that is the subject of this litigation constitutes commercial speech. They also claim plaintiffs have failed to present evidence sufficient to establish that they have a probability of prevailing on the merits. We agree and reverse.

## FACTUAL BACKGROUND

Defendants are the publishers of Rolling Stone magazine. The named plaintiffs in this class action lawsuit are "indie rock" musicians whose band

---

[1] All further statutory references are to the Code of Civil Procedure except as otherwise indicated.

names are included with the names of over 100 other bands in an editorial feature entitled *Indie Rock Universe* (the Feature) that appeared in the November 15, 2007 issue of Rolling Stone.[2] The named plaintiffs are musicians James Stewart, Devin Hoff, and Caralee McElroy of the band "Xiu Xiu," along with Michael Haliechuk, Damian Abraham, and Sandy Miranda of the band "Fucked Up" (altered in the complaint to appear as "F****d Up"). They purport to represent "a defined class of some 186 independent music performers" whose names appear in the Feature.

The Feature consists primarily of a four-page foldout described by the parties as a "butterfly gatefold." The layout is explained by defendants as follows: "Typically, a gatefold consists of four advertising pages and five editorial pages laid out as follows: the first page of the editorial feature runs as a traditional page of editorial copy on a right-hand page, with an ad on the left-hand page. The first editorial page usually has a notation at the bottom corner that there is a 'special foldout inside.' When the page is turned, two pages of advertising appear as a 'gate,' and these two pages can be opened like French doors. When opened, the two advertising pages end up on the back of the four page continuation of the editorial feature and are no longer visible when one is reading and viewing the editorial feature."

The Feature is listed along with two other similar entries in the magazine's table of contents under the heading "Special Foldout Sections."[3] The table of contents identifies the Feature as beginning on page 65. The Feature consists of five pages. Each page contains hand-drawn cartoonlike illustrations accompanied by both handwritten and typeset text. The first page, which is on the right-hand side of the magazine at page 65, reveals an image resembling a well-used spiral notebook, complete with doodles, resting on what appears to be a wooden desktop. The title *Indie Rock Universe* appears on the notebook's cover in large handwritten block capital letters. Below this title, the cover states: "an alternate dimension where everyone wears black Converse." Just below the notebook, the lower right-hand corner of the page states: "SPECIAL FOLDOUT INSIDE >>>." In a smaller font size, the lower left-hand corner states: "ILLUSTRATIONS BY BENJAMIN MARRA." It

---

[2] "Indie rock" has been described as follows: "Indie rock takes its name from 'independent,' which describes both the do-it-yourself attitudes of its bands and the small, lower-budget nature of the labels that release the music. The biggest indie labels might strike distribution deals with major corporate labels, but their decision-making processes remain autonomous. As such, indie rock is free to explore sounds, emotions, and lyrical subjects that don't appeal to large, mainstream audiences—profit isn't as much of a concern as personal taste . . . . It's very much rooted in the sound and sensibility of American underground and alternative rock of the '80s, albeit with a few differences that account for the changes in underground rock since then." (<http://www.allmusic.com/cg/amg.dll?p=amg&sql=77:2687> [as of Jan. 28, 2010].)

[3] The other foldout sections are entitled *The Almost-Impossible Rock & Roll Quiz* and *The Future of Music*.

appears Benjamin Marra only did the illustrating for the article and was not involved with the advertising pages in dispute.

The opposite page, on the magazine's left-hand side, contains a full-page advertisement for Camel cigarettes.[4] The background of the ad is a photograph of a flat grassy field with a stylized blue sky, upon which is centered a collage of photographs. At the center of the collage is the upper body of a woman with a tattooed arm and a pink streak in her hair, wearing a plain black top. The woman is writing with a pen on a small lined notepad. She is surrounded by images of pink flowers, an audio speaker, an old-fashioned Victrola record player, and a few small birds. A hand appears from behind a group of flowers on the right side of the collage, its index finger pointed to the right. A small bird is perched on this finger. Above the collage is the arched "CAMEL" logo in large letters. Beneath the collage is a ribbonlike banner with the words "WELCOME TO THE FARM." The surgeon general's warning appears in a rectangular box in the lower left corner. In the right corner, the following language appears: "*Website restricted to legal age tobacco consumers. Events age restricted, ID required. Talent, locations and details subject to change. 16 mg. 'tar', 1.3 mg. nicotine av. per cigarette by FTC method. Actual amount may vary depending on how you smoke. For T&N info, please visit www.rjrttarnic.com."

When the first page of the Feature (p. 65) is turned, the Camel ad continues on both sides of the "gate," appearing as a two-page spread. The ad's rural background and collage design theme continues. Imposed over the grassy landscape on the lower portion of both pages are overlapping images of a woman in a strawhat driving an old tractor with film reels for wheels, a Victrola, farm animals, flowers, birds, a floating radio with a propeller, and a disembodied hand that emerges from a small framed mirror being carried by a flying bald eagle, along with a television, radios, and audio speakers placed on stems that appear to be growing from the ground. The upper left corner of the left-hand page contains a smaller version of the "CAMEL" lettering. Below that word is a logo consisting of the words "the FARM; fREE RANGE MUSIC" [sic] with a small silhouetted image of a camel situated to the right. In large letters spanning over the blue sky on the upper portion of both pages, the ad continues: "COMMITTED TO SUPPORTING & PROMOTING INDEPENDENT RECORD LABELS."

The lower right-hand side of the right page contains a ribbonlike banner stating: "THE BEST MUSIC RISES FROM THE UNDERGROUND." Just below this banner is the following paragraph: "The world of independent music is constantly changing. New styles and sounds emerge daily. That's why we're bringing you The FARM. A collaboration between Camel and

---

[4] This first page of the Camel ad is page 64 of the magazine, though it is unnumbered.

independent artists and record labels. It's our way of supporting these innovators as they rise up to bring their sounds to the surface. We give them more opportunities to be heard through online music and countless events across the nation. [¶] Visit THEFARMROCKS.COM* [¶] Free shows, great bands and more!" Situated to the left of this paragraph is the upper body of a smiling woman raising her left hand across her chest and pointing to the left. The surgeon general's warning appears again, this time on the lower left side of the left-hand page. The lower right corner of the right page contains the following text: "*Website restricted to legal age tobacco consumers."

When both pages of the "gate" are opened, the Feature reappears as a continuous four-page illustration. As described by defendants, the Feature "is reminiscent of doodling on several pages of a notebook, presenting a futuristic vision organizing the collective 'universe' of indie rock bands. The four page interior includes hand-sketched planets, intergalactic creatures and spaceships. . . . Its drawings in turn are tied to the organization of the 186 bands identified, including such categories as Animal Planet (bands with animal names) or Lupus Major (bands with 'wolf' in their name) and such aesthetic categories as Intergalactic Ear Killers and Masters of the Universe." The band Fucked Up is listed in the "Intergalactic Ear Killers" category, under the subtitle: "In space, no one can hear you scream." The band Xiu Xiu appears in a list under the subtitle "Fight the power," which is placed adjacent to a grimacing red ball with arms and clenched fists, identified as "Angry Red Planet." None of the language, logos, or images used in the Camel ad appear in the pages of the Feature.

When the "gate" pages are folded back to reenclose the feature, and the right page is turned, another full-page Camel ad appears on the left-hand side. The look and feel of this page is similar to the ad's previous pages. The "fREE RANGE MUSIC" logo appears again, this time above another collage consisting of a rooster, an old television, flowers, a small bird, and a man in a dark suit who is facing to the right, with his hand pointing to the right. Just below the collage, another ribbon banner states: "FOR THE BEST NEW SOUNDS, VISIT THE FARMROCKS.COM*." The surgeon general's warning appears again in the lower left corner of the page. The right corner contains the same language regarding age restrictions and tar and nicotine content that appears on the first page of the ad.[5]

---

[5] The upper corners of three of the four pages comprising the Camel ad also display the following in small black lettering: "©2007(4) R.J. REYNOLDS TOBACCO CO. [¶] CAMEL FILTERS [¶] M7CFB010."

# PROCEDURAL HISTORY

On December 17, 2007, plaintiffs filed their class action complaint against defendants and R.J. Reynolds Tobacco Company (R.J. Reynolds),[6] alleging three causes of action: (1) unauthorized use of name in violation of Civil Code section 3344, (2) unauthorized use of name for commercial advantage (right of publicity), and (3) unfair business practice in violation of Business and Professions Code sections 17200–17203. The gravamen of the complaint is that defendants and R.J. Reynolds "used the artist names of plaintiffs and the members of the Class knowingly and deliberately for the commercial purpose of advertising Camel cigarettes" without their prior authorization.

On February 19, 2008, defendants filed their motion to strike pursuant to section 425.16. In their moving papers, they argued that all three causes of action asserted by plaintiffs are subject to the statute because they "arise from alleged conduct that involves Rolling Stone's exercise of its free speech rights about a matter of public interest." They also asserted plaintiffs would be unlikely to prevail on the merits of their claims, primarily because the Feature represents "non-commercial speech, absolutely protected by the First Amendment," and because the bands' names were not used for a commercial purpose.

On July 14, 2008, the trial court issued its order denying defendants' motion to strike. The court based its denial on the ground that defendants, by their "layout decision," had published "an allegedly integrated 9-page advertisement" for Camel cigarettes. The court found a trier of fact could conclude the Feature had been transformed into commercial speech by virtue of having become "inextricably entwined" with R.J. Reynolds's surrounding Camel advertisement. This appeal followed.

# DISCUSSION

## I. Section 425.16 and the Standard of Review

■ Section 425.16, known as the anti-SLAPP statute, provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) "The phrase 'arising from' . . . has been interpreted to mean that 'the act underlying the plaintiff's cause' or

---

[6] R.J. Reynolds is not a party to this appeal.

'the act which forms the basis for the plaintiff's cause of action' must have been an act in furtherance of the right of petition or free speech." (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1001 [113 Cal.Rptr.2d 625].) "The goal [of section 425.16] is to eliminate meritless or retaliatory litigation at an early stage of the proceedings." (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 806 [119 Cal.Rptr.2d 108].)

█ Courts engage in a two-step process in determining whether a cause of action is subject to a special motion to strike under section 425.16. First, the court determines if the challenged cause of action arises from protected activity. If the defendant makes such a showing, the burden shifts to the plaintiff to establish, with admissible evidence, a reasonable probability of prevailing on the merits. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703].) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Id.* at p. 89.)

A ruling on a section 425.16 motion is reviewed de novo. (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645 [24 Cal.Rptr.3d 619].) We review the record independently to determine whether the asserted cause of action arises from activity protected under the statute and, if so, whether the plaintiff has shown a probability of prevailing on the merits. (*ComputerXpress, Inc. v. Jackson, supra,* 93 Cal.App.4th 993, 999; *Seelig v. Infinity Broadcasting Corp., supra,* 97 Cal.App.4th 798, 807.)

II. *Is the First Prong of the Anti-SLAPP Test Met?*

Before we consider whether the conduct or speech at issue is protected by section 425.16, we will address plaintiffs' contention that this case is excepted from the reach of the anti-SLAPP statute under section 425.17, subdivision (c).

A. *Section 425.17, subdivision (c)*

█ Section 425.17 was adopted in 2003 to address "a disturbing abuse of Section 425.16 . . . ." (§ 425.17, subd. (a).) Section 425.17 exempts certain lawsuits from the ambit of the anti-SLAPP statute. As such, "it raises a threshold issue, and we address it prior to examining the applicability of section 425.16." (*Navarro v. IHOP Properties, Inc.* (2005) 134 Cal.App.4th 834, 840 [36 Cal.Rptr.3d 385].)

"Section 425.17, subdivisions (b) and (c) enumerate circumstances where the special motion to strike screening mechanism is unavailable. [Citations.] Section 425.17, subdivision (c) creates an exception to the special motion to strike screening provision for specified claims against business entities."[7] (*Sunset Millennium Associates, LLC v. LHO Grafton Hotel, L.P.* (2006) 146 Cal.App.4th 300, 312 [52 Cal.Rptr.3d 828].) "The exemption covers 'any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person . . . ,' if *two conditions* exist: (1) the statement or conduct consists of *representations of fact about the business operations, goods or services of the person or a business competitor, and* 'is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services,' *or* in the course of delivering the goods or services, and (2) '[t]he intended audience is an actual or potential buyer or customer . . . .' (§ 425.17, subd. (c)(1), (2).)"[8] (*Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482, 490 [72 Cal.Rptr.3d 847], italics added.)[9]

We fail to see how section 425.17, subdivision (c), has any application to the present case. It is true that defendants are "primarily engaged in the business of selling goods," however, as plaintiffs concede, the goods they sell are copies of Rolling Stone magazine, not Camel cigarettes. More significantly, the statement or conduct at issue here did not consist of "representations of fact about the business operations, goods or services" of Rolling Stone or of any of defendants' business competitors. Instead, the representation at the center of this lawsuit is the representation that plaintiffs and their fellow musicians endorse the sale and use of Camel cigarettes. Accordingly,

---

[7] "[Section 425.17,] subdivision (b) appears to exempt class actions and private attorney general suits from treatment under section 425.16." (*Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th 1050, 1066 [28 Cal.Rptr.3d 933].)

[8] We have granted defendants' request for judicial notice (filed Jan. 16, 2009) of the legislative history of Senate Bill No. 515 (2003–2004 Reg. Sess.), which was adopted as was section 425.17, and the legislative history of Senate Bill No. 1651 (2001–2002 Reg. Sess.).

[9] Note the case of *Simpson Strong-Tie Co. Inc. v. Gore* (Cal. App.), relied upon by the trial court, is no longer citable as it has been accepted for review by the Supreme Court on July 30, 2008, S164174. The issues to be briefed and argued to the Supreme Court are: "(1) Which party bears the burden of persuasion with respect to the applicability of the anti-SLAPP exemptions set forth in Code of Civil Procedure section 425.17, subdivision (c)? and (2) Does Code of Civil Procedure section 425.17, subdivision (c) exempt from anti-SLAPP protection an advertisement by a lawyer soliciting clients for a contemplated lawsuit?" (*Simpson Strong-Tie Co. Inc. v. Gore*, S164174, Supreme Ct. Mins., July 30, 2008.)

the first condition set forth in section 425.17, subdivision (c), is not satisfied with respect to defendants and this limited exemption is therefore inapplicable.[10]

## B. *The Feature is protected under section 425.16*

Defendants contend section 425.16 applies to the Feature because the piece concerns a matter of public interest.[11] The trial court disagreed with this argument, but found the Feature was nevertheless protected speech, reasoning that defendants' "layout decision" with respect to the placement of the Feature was entitled to First Amendment protection. Plaintiffs do not contend the Feature does not pertain to a matter of public interest. Instead, they claim that section 425.16 does not apply because the Feature is part of a nine-page "unified advertising vehicle" for Camel cigarettes and is therefore unprotected "commercial speech." We are not persuaded.

■ A statement or other conduct is made "in connection with a public issue or an issue of public interest" (§ 425.16, subd. (e)(4)) "if the statement or conduct concerns a topic of widespread public interest and contributes in some manner to a public discussion of the topic." (*Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1347 [63 Cal.Rptr.3d 798].) The five-page Feature prepared by defendants concerns an extremely popular genre of music, and is a creatively crafted, whimsical editorial commentary on the many bands whose musical works have contributed to the development of the genre. As other courts have noted, " 'there is a public interest which attaches

---

[10] We thus need not address defendants' alternative argument that they are exempt from the application of section 425.17, subdivision (c), under the first and second exceptions contained in subdivision (d). Subdivision (d) exempts the following persons from the reach of subdivision (c): "(1) Any person enumerated in subdivision (b) of Section 2 of Article I of the California Constitution or Section 1070 of the Evidence Code, or any person engaged in the dissemination of ideas or expression in any book or academic journal, while engaged in the gathering, receiving, or processing of information for communication to the public. [¶] (2) Any action against any person or entity based upon the creation, dissemination, exhibition, advertisement, or other similar promotion of any dramatic, literary, musical, political, or artistic work, including, but not limited to, a motion picture or television program, or an article published in a newspaper or magazine of general circulation. [¶] (3) Any nonprofit organization that receives more than 50 percent of its annual revenues from federal, state, or local government grants, awards, programs, or reimbursements for services rendered."

[11] The speech protected by section 425.16 falls into the following four categories: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) *or any other conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest.*" (§ 425.16, subd. (e), italics added.)

to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities. . . .' [Citation.]" (*Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 422 [198 Cal.Rptr. 342] (*Eastwood*).) We conclude that the act from which the complaint arises, namely, publication of the bands' names within the graphic design of the Feature, constitutes conduct in furtherance of defendants' right of free speech "in connection with a public issue or an issue of public interest." Accordingly, the first prong of the anti-SLAPP test is satisfied.

As noted above, the trial court found that defendants' decision to place the Feature within the gatefold format was protected by the First Amendment. Defendants invoke *Pittsburgh Press Co. v. Human Rel. Comm'n* (1973) 413 U.S. 376 [37 L.Ed.2d 669, 93 S.Ct. 2553], wherein the Supreme Court observed: "If a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to *the choice of editorial position*—would be subject to regulation if it could be established that they were conducted with a view toward increased sales. Such a basis for regulation clearly would be incompatible with the First Amendment." (*Id.* at p. 385, italics added.) As we will discuss further below, we agree with the trial court's conclusion that editorial positioning decisions may be entitled to protection under the First Amendment. In our view, however, it is the Feature itself, irrespective of defendants' layout decision, that constitutes protected speech within the meaning of section 425.16, subdivision (e)(4).

Plaintiffs claim that the anti-SLAPP statute has no application to their complaint because the provision "does not protect commercial speech." They fault the trial court's rationale, arguing that the ruling cannot be justified in the absence of a finding that defendants' placement decision "was *completely* editorial in nature." They also claim that the ruling is erroneous because their causes of action do not target defendants' "editorial decision." These arguments fail.

Plaintiffs have not provided us with any authority for the proposition that commercial speech is categorically disentitled to protection under the anti-SLAPP statute. Indeed, they appear to rely solely on the limited exception for commercial speech found in section 425.17, subdivision (c), which we have already concluded does not apply. Second, as noted above, the trial court's conclusions regarding defendants' editorial placement decisions are not entirely relevant to the issue of whether the Feature is protected under section 425.16, subdivision (e)(4), because it represents speech made in connection with "an issue of public interest." Thus, we need not consider here whether defendants' placement decision was either completely or partly editorial.

■ Finally, we observe " 'The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability and whether that activity constitutes protected speech or petitioning.' [Citation.]" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1244 [29 Cal.Rptr.3d 521].) Thus, we do not evaluate the first prong of the anti-SLAPP test solely through the lens of a plaintiff's cause of action. Defendants' acts on which the counts alleged in the complaint are based, are the acts of designing and publishing, within the advertising gatefold layout, an editorial feature containing plaintiffs' band names. Those acts arose from protected activity for purposes of the anti-SLAPP statute as they were done in furtherance of defendants' constitutional right of freedom of speech made in connection with a public issue. We turn to the second prong of the anti-SLAPP test.

### III. *Probability of Prevailing on the Merits*

■ "To demonstrate a probability of prevailing on the merits, the plaintiff must show that the complaint is legally sufficient and must present a prima facie showing of facts that, if believed by the trier of fact, would support a judgment in the plaintiff's favor. [Citations.] The plaintiff's showing of facts must consist of evidence that would be admissible at trial. [Citation.] The court cannot weigh the evidence, but must determine whether the evidence is sufficient to support a judgment in the plaintiff's favor as a matter of law, as on a motion for summary judgment. [Citations.] If the plaintiff presents a sufficient prima facie showing of facts, the moving defendant can defeat the plaintiff's evidentiary showing only if the defendant's evidence establishes as a matter of law that the plaintiff cannot prevail." (*Hall v. Time Warner, Inc., supra*, 153 Cal.App.4th 1337, 1346.)

As noted above, plaintiffs alleged three causes of action against defendants: (1) unauthorized use of name in violation of Civil Code section 3344, (2) unauthorized use of name for commercial advantage (right of publicity), and (3) unfair business practice in violation of Business and Professions Code sections 17200–17203 (unfair competition law, or UCL).

■ California has long recognized a common law right of privacy for protection of a person's name and likeness against appropriation by others for their advantage. (*Eastwood, supra*, 149 Cal.App.3d 409, 416.) To sustain a common law cause of action for commercial misappropriation, a plaintiff must prove: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." (*Id.* at p. 417.)

■ In addition to the common law cause of action, California has provided a statutory remedy for commercial misappropriation under Civil Code section 3344, which provides, in relevant part, "[a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner . . . for purposes of advertising . . . without such person's prior consent . . . shall be liable for any damages sustained by the person . . . ."[12] "Under section 3344, a plaintiff must prove all the elements of the common law cause of action. In addition, the plaintiff must allege a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose." (*Downing v. Abercrombie & Fitch* (9th Cir. 2001) 265 F.3d 994, 1001 (*Downing*).) The statute has an express exemption for use "in connection with any news, public affairs, or sports broadcast or account, or any political campaign." (§ 3344, subd. (d).) This is similar to the exception developed under the common law right for publication of matters of public interest. (*Eastwood, supra,* 149 Cal.App.3d 409, 421; *Montana v. San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 793–794 [40 Cal.Rptr.2d 639] (*Montana*); *Dora v. Frontline Video, Inc.* (1993) 15 Cal.App.4th 536, 542, 545 [18 Cal.Rptr.2d 790].)

■ "[T]o state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, 'it is necessary only to show that "members of the public are likely to be deceived." ' [Citations.]" (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 951 [119 Cal.Rptr.2d 296, 45 P.3d 243].) To have standing to bring such a claim, a plaintiff must show that he or she has "suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204.)

## A. *The First Amendment defense*

Defendants invoke their First Amendment right to freedom of speech as a defense to plaintiffs' complaint, and assert the causes of action fail because plaintiffs have not established that defendants acted with "actual malice." Plaintiffs contend that the defense, including the constitutional "actual malice" standard, applies to defamation lawsuits only, and not to claims brought under Civil Code section 3344. They are wrong.

### 1. *Application to misappropriation claims*

■ In *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279–280 [11 L.Ed.2d 686, 84 S.Ct. 710] the United States Supreme Court held that a

---

[12] We have granted the request of amici curiae American Media, Inc., et al., filed August 17, 2009, that we take judicial notice of a November 10, 1971 letter from Assemblyman John Vasconcellos to then-Governor Ronald Reagan asking the Governor to sign Assembly Bill No. 826 (1971 Reg. Sess.), enacting Civil Code section 3344 (Stats. 1971, ch. 1595, § 1, p. 3426).

plaintiff who is either a public official or public figure may not recover damages for defamation absent proof that the defendant published defamatory statements with "actual malice," that is, either with knowledge of their falsity or with reckless disregard for the truth. "Since [*Sullivan*], it is clear that the First Amendment generally precludes the imposition of liability upon a publisher for its expressive activities, except upon a finding of fault." (*Eastwood, supra*, 149 Cal.App.3d 409, 423.)

 The First Amendment has been invoked by media defendants in cases involving commercial misappropriation. "As do other torts involving invasion of the right of privacy, the tort of appropriation of name and personality, whether labeled a form of intrusion into privacy or a publicity right, invokes constitutional protections. 'Publication of matters in the public interest, which rests on the right of the public to know, and the freedom of the press to tell it, cannot ordinarily be actionable. [Citations.]' [Citation.]" (*Maheu v. CBS, Inc.* (1988) 201 Cal.App.3d 662, 676–677 [247 Cal.Rptr. 304]; see also *Montana, supra*, 34 Cal.App.4th 790, 793.) The defense is not limited to news stories on current events: "Entertainment features receive the same constitutional protection as factual news reports." (*Gionfriddo v. Major League Baseball* (2001) 94 Cal.App.4th 400, 410 [114 Cal.Rptr.2d 307].)[13]

Contrary to plaintiffs' contention, the actual malice standard has been applied to claims similar to theirs. In *Eastwood*, a case involving a claim for commercial misappropriation brought under Civil Code section 3344, the appellate court observed "whether the focus is on the status of [the actor Clint Eastwood], or upon the materials published in the Enquirer article, scienter of the alleged calculated falsehood is the proper standard of fault to impose liability on the Enquirer, contrary to the position of Eastwood, that calculated falsehood alone is enough."[14] (*Eastwood, supra*, 149 Cal.App.3d 409, 425.) The facts of the case concerned an allegedly false article published in the Enquirer magazine regarding the actor's involvement in a "love triangle," which the publisher touted in its promotional advertisements. The court

---

[13] See also *Guglielmi v. Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 867 [160 Cal.Rptr. 352, 603 P.2d 454] (conc. opn. of Bird, C. J.). "Our courts have often observed that entertainment is entitled to the same constitutional protection as the exposition of ideas. That conclusion rests on two propositions. First, '[t]he line between the informing and the entertaining is too elusive for the protection of the basic right. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another doctrine.' [Citation.] Second, entertainment, as a mode of self-expression, is entitled to constitutional protection irrespective of its contribution to the marketplace of ideas. 'For expression is an integral part of the development of ideas, of mental exploration and of the affirmation of self. The power to realize his potentiality as a human being begins at this point and must extend at least this far if the whole nature of man is not to be thwarted. . . .' [Citation.]" (*Ibid.*, fn. omitted.)

[14] The appellate court intentionally substituted the word "scienter" for the term "actual malice." (*Eastwood, supra*, 149 Cal.App.3d 409, 424 & fn. 8.)

granted the plaintiff's petition for writ of mandamus, overturning the trial court's granting of the defendant's demur without leave to amend, and ordered the trial court to grant leave to amend to allow the actor to allege the article had been "published with knowledge or in reckless disregard of its falsity." (*Id.* at p. 426.)

█ Additionally, our Supreme Court has cautioned: "Giving broad scope to the right of publicity has the potential of allowing a celebrity to accomplish through the vigorous exercise of that right the censorship of unflattering commentary that cannot be constitutionally accomplished through defamation actions." (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 398 [106 Cal.Rptr.2d 126, 21 P.3d 797] (*Comedy III*).) We conclude a defendant publisher may assert that the actual malice standard applies to claims for commercial misappropriation, whether the claims are brought under the common law or under Civil Code section 3344.

### 2. *Noncommercial versus commercial speech*

The trial court concluded the Feature could be characterized as commercial speech, freeing plaintiffs from the burden of proving by clear and convincing evidence that defendants had acted with actual malice. Defendants claim the court's finding is erroneous.

█ "The freedom of expression protected by the First Amendment exists to preserve an uninhibited marketplace of ideas and to further individual rights of self-expression. [Citation.] The protections may extend to all forms of expression, including written and spoken words (fact or fiction), music, films, paintings, and entertainment, *whether or not sold for a profit.*" (*Kirby v. Sega of America, Inc.* (2006) 144 Cal.App.4th 47, 57–58 [50 Cal.Rptr.3d 607], italics added.) █ As noted above, speech about public figures is accorded heightened First Amendment protection. In libel actions, for example, public figures may prevail only if they prove that the defendant's defamatory statements were made with actual malice, whereas private figures need prove only negligence. (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997] (*Gertz*).) "The rationale for such differential treatment is, first, that the public figure has greater access to the media and therefore greater opportunity to rebut defamatory statements, and second, that those who have become public figures have done so voluntarily and therefore 'invite attention and comment.' [Citation.]" (*Comedy III, supra*, 25 Cal.4th 387, 398.) Plaintiffs do not contest the trial court's finding that they qualify as "limited purpose public figures."[15]

---

[15] "[The public figure] designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects

■ Even commercial speech is entitled to a measure of First Amendment protection. (See, e.g., *Greater New Orleans Broadcasting Assn., Inc. v. United States* (1999) 527 U.S. 173, 183 [144 L.Ed.2d 161, 119 S.Ct. 1923] [setting out four-part test to evaluate constitutionality of governmental regulation of "speech that is 'commercial' in nature"].) Commercial messages, however, do not receive the same level of constitutional protection as other types of protected expression. (*44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, 498 [134 L.Ed.2d 711, 116 S.Ct. 1495].) False or misleading commercial speech is not protected. (See *Florida Bar v. Went For It, Inc.* (1995) 515 U.S. 618, 623–624 [132 L.Ed.2d 541, 115 S.Ct. 2371] [commercial speech receives limited amount of protection compared to speech at core of 1st Amend. and may freely be regulated if it is misleading].) Further, when speech is properly classified as commercial, a public figure plaintiff does not have to show that the speaker acted with actual malice. (See *Procter & Gamble Co. v. Amway Corp.* (5th Cir. 2001) 242 F.3d 539, 556 ["Supreme Court precedent prevents us from importing the actual-malice standard into cases involving false commercial speech."].)

B. *The Feature is noncommercial speech as a matter of law*

In disagreeing with defendants' contention that the Feature qualifies for full First Amendment protection, the trial court stated "The trier of fact could find that Rolling Stone 'inextricably entwined' Indie Rock Universe with the surrounding Camel advertisement and that Indie Rock Universe therefore assumed the nature of commercial speech." We disagree with the court's decision to defer the issue to a trier of fact, and conclude the Feature is noncommercial speech as a matter of law.[16]

1. Kasky v. Nike, Inc. *(2002) 27 Cal.4th 939 [119 Cal.Rptr.2d 296, 45 P.3d 243] (Kasky)*

■ Our Supreme Court has developed a framework for analyzing whether speech is commercial or noncommercial: "[W]hen a court must decide whether particular speech may be subjected to laws aimed at preventing false advertising *or other forms of commercial deception*, categorizing a particular statement as commercial or noncommercial speech requires consideration of three elements: the speaker, the intended audience, and the content

himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." (*Gertz, supra*, 418 U.S. 323, 351.)

[16] As the parties do not appear to have any disagreements as to the facts of this case, but rather disagree as to how the law should be applied with respect to those facts, it is unclear to us what purpose would be served by deferring ruling on this issue to a court or jury trial.

of the message." (*Kasky, supra*, 27 Cal.4th 939, 960, some italics omitted.)[17] We examine these three elements in turn with respect to the Feature.

 With respect to the identity of the speaker, the court noted: "In typical commercial speech cases, the *speaker* is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged, and the *intended audience* is likely to be actual or potential buyers or customers *of the speaker's goods or services*, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers." (*Kasky, supra*, 27 Cal.4th 939, 960, third italics added.) Thus, a commercial speaker is one who has a direct business interest in the goods that are the subject of the speech at issue.

In the present case, the speakers against whom plaintiffs seek redress are the purveyors of Rolling Stone magazine. As we have already noted, while the magazine is "engaged in commerce," it is not engaged in the production, distribution, or sale of cigarettes. Nor does it represent cigarette manufacturers. As the court in *Kasky* observed, relevant United States Supreme Court commercial speech decisions have "concerned a speaker *engaged in the sale or hire of products or services* conveying a message to a person or persons likely to want, and be willing to pay for, *that product or service*." (*Kasky, supra*, 27 Cal.4th 939, 960, italics added.) While defendants sell advertising that markets goods and services, they have no direct financial interest in the companies that purchase this advertising or in the products these advertisers sell. Rolling Stone magazine is merely the medium through which commercial messages are delivered by the actual commercial speakers, namely, the advertisers themselves. Rolling Stone magazine is primarily a periodical commentating on events of political and cultural interests of the day. Its articles critically assess these interests. While advertising naturally assists in the financing of the magazine, the publication's editorial purpose is the presentation of written analysis of the contemporary American scene—noncommercial speech.

Consideration of the other two *Kasky* factors also supports the conclusion that the speech at issue is noncommercial. While the "intended audience" presumably includes everyone who purchased the magazine, the content

---

[17] Against the argument that speech about issues of public importance or controversy must be considered noncommercial speech, the Supreme Court in *Kasky* held "when a corporation, to maintain and increase its sales and profits, makes public statements defending labor practices and working conditions at factories where its products are made, those public statements are commercial speech that may be regulated to prevent consumer deception." (*Kasky, supra*, 27 Cal.4th 939, 969.)

of R.J. Reynolds's commercial message has nothing to do with Rolling Stone. The magazine is not referenced in the advertisement, nor is it referenced in the Feature itself, apart from the editorial footer that appears on page 65. Thus, application of the *Kasky* factors supports the conclusion that the Feature is editorial, noncommercial speech.

### 2. Ninth Circuit cases

 The Ninth Circuit has considered the distinction between commercial and noncommercial speech: " 'Although the boundary between commercial and noncommercial speech has yet to be clearly delineated, the "core notion of commercial speech" is that it "does no more than propose a commercial transaction." ' [Citation.] If speech is not 'purely commercial'— that is, *if it does more than propose a commercial transaction*—then it is entitled to full First Amendment protection. [Citation.]" (*Mattel, Inc. v. MCA Records, Inc.* (9th Cir. 2002) 296 F.3d 894, 906, italics added.)

We find the case of *Hoffman v. Capital Cities/ABC, Inc.* (9th Cir. 2001) 255 F.3d 1180 (*Hoffman*) to be instructive. In *Hoffman*, Los Angeles magazine published an article entitled *Grand Illusions*, which featured digitally altered images from famous films. Computer artists had modified shots of Dustin Hoffman, Cary Grant, Marilyn Monroe, and others to put the actors and actresses in famous designers' current spring fashions. A still of Hoffman from the movie Tootsie was altered so that he appeared to be wearing a Richard Tyler evening gown and Ralph Lauren heels. Elsewhere in the magazine, there was a Ralph Lauren advertisement that did not feature shoes. Hoffman, who had not given permission, sued under the federal Lanham Act[18] and for violation of his right to publicity. (*Hoffman, supra*, at p. 1183.)

The Ninth Circuit found the article featuring the altered image clearly served a commercial purpose, which was "to draw attention to the for-profit magazine in which it appear[ed]" and to sell more copies. (*Hoffman, supra*, 255 F.3d 1180, 1186.) Nevertheless, the court held that the article was fully protected under the First Amendment because it included protected expression and because its commercial purpose was " 'inextricably entwined' with [these] expressive elements." (*Id.* at p. 1185.) The plaintiff was thus required to prove by clear and convincing evidence that the magazine had acted with actual malice. (*Id.* at pp. 1186–1187.) The court concluded Mr. Hoffman had not met that burden and directed that judgment be entered in favor of the magazine. (*Id.* at p. 1189.)

In its opinion, the Ninth Circuit distinguished the article from a typical commercial advertisement: "If the altered photograph had appeared in a

---

[18] Section 1051 et seq. of title 15 of the United States Code.

Ralph Lauren advertisement, then we would be facing a case much like those [that have found commercial misappropriation]. But [the magazine] did not use Hoffman's image in a traditional advertisement printed merely for the purpose of selling a particular product. Insofar as the record shows, [the magazine] did not receive any consideration from the designers for featuring their clothing in the fashion article containing the altered movie stills. Nor did the article simply advance a commercial message. 'Grand Illusions' appears as a feature article on the cover of the magazine and in the table of contents. It is a complement to and a part of the issue's focus on Hollywood past and present. Viewed in context, the article as a whole is a combination of fashion photography, humor, and visual and verbal editorial comment on classic films and famous actors. Any commercial aspects are 'inextricably entwined' with expressive elements, and so they cannot be separated out 'from the fully protected whole.' [Citations.] 'There are commonsense differences between speech that does no more than propose a commercial transaction and other varieties,' [citation], and common sense tells us this is not a simple advertisement." (*Hoffman, supra,* 255 F.3d 1180, 1185–1186.)

In contrast, in *Downing,* the Ninth Circuit held that a claim based on the right of publicity was not defeated by the First Amendment defense. The defendant, a clothing retailer, was developing a surfing theme—Surf Nekkid—for its subscription catalog. It published a photo of the plaintiffs, who were participants in a surf championship in Hawaii in 1965. Without obtaining the plaintiffs' consent to use their names and images, it also offered T-shirts exactly like those worn by the plaintiffs in the photo. The appellate court determined the defendant used the plaintiffs' photograph "essentially as window-dressing to advance the catalog's surf-theme." (*Downing, supra,* 265 F.3d 994, 1002.) Contrasting these facts with those of *Hoffman,* the court concluded that the First Amendment defense did not apply because the photo did "not contribute significantly to a matter of . . . public interest . . . ." (*Downing, supra,* at p. 1002.)

### 3. *Application to the Feature*

Plaintiffs claim "It is hard to tell where, if at all, the Camel cigarettes advertisement begins and ends." We have examined the pages at issue and do not perceive the distinction between the ad and the Feature to be as close as plaintiffs allege. The graphic designs of the ad and the Feature are quite different, one being based on hand-drawn cartoons and the other being based on collages of photographs. The background of the Feature is white college-ruled paper, not a grassy rural landscape. It is undisputed that, standing alone, the Feature itself is completely devoid of any commercial message. In fact, the only nexus between the ad and the Feature is the mutual references to

independent music. None of the band names in the Feature appear in the Camel ad, and none of the language or elements of the Camel ad appear in the Feature. This distinguishes the present case from *Downing*, wherein the photograph of the surfers was explicitly used to market replicas of the same T-shirts that the surfers were wearing. (*Downing, supra*, 265 F.3d 994, 1000.) Further, plaintiffs have not cited us to a case, and our research has disclosed none, in which a magazine's editorial content has been deemed transformed into commercial speech merely because of its proximity to advertisements touching on the same subject matter.

The trial court found it significant that a similar five-page feature entitled *Hip-Hop Galaxy*, which was published by defendants in the December 15, 2005 issue of Rolling Stone and served as the model for the Feature, contained standard typeface, a statement that the graphic feature was being presented by Rolling Stone, and was surrounded by a typical editorial border design. We find these distinctions interesting, but not determinative. While there is no border on the Feature's four-page spread, this would appear to be consistent with the artistic theme of the Feature, namely, being derived from doodles on lined notebook paper. Insofar as the Feature is distinct from the *Hip-Hop Galaxy* feature, it is equally distinct from the graphic design elements used in the Camel ad.[19]

We also do not find the fact that the introductory page of the feature is not in the standard Rolling Stone typeface to be determinative. The Feature is listed in the issue's table of contents, and the lack of standard typeface is simply a product of the presentation style chosen by the artist. Further, the standard Rolling Stone border does appear on the first page of the Feature, though it is somewhat obscured by the spiral notebook image. Additionally, the legend "ROLLING STONE, NOVEMBER 15, 2007" appears on the lower right-hand corner adjacent to the page number and does not appear on any pages of the Camel ad.[20]

---

[19] The gatefold pages surrounding the *Hip-Hop Galaxy* feature are comprised of an ad for Pontiac automobiles. Various references in the ad appear to reflect the theme of the enclosed feature. For example, the right-hand side "gate" page states, in part: "INSPIRE LYRICS. [¶] Inspire long ones. Fast ones. [¶] Flowing ones. Dramatic ones."

[20] We have also reviewed the two other gatefolds that appear in Rolling Stone's November 15, 2007 issue. While it is true that they contain the black editorial border that typically appears around Rolling Stone's articles, they are not similar to the design utilized by the Feature. In one feature, the four interior pages consist of text with standard content featuring interviews with various popular musicians. The other foldout, *The Almost-Impossible Rock & Roll Quiz*, is also not a contiguous illustration. Additionally, we note this feature is surrounded by an ad for the 2007 American Music Awards. Interestingly, this ad also extends over the lower portion of the four-page feature foldout itself, as opposed to the Feature at issue in this case, whose pages are completely bereft of any advertising.

There can be no question that the Feature is expressive. Even if we assume that it is somehow incorporated into the Camel ad by virtue of its placement in the magazine, its supposed "commercial purpose" would be "inextricably entwined" with its expressive elements, namely, the fanciful depiction of this genre of music as a universe, complete with planets and constellations that define the various styles and artists whose music has contributed to this genre. The employment by Rolling Stone of whimsical expression in designing informational pages of its magazine should not necessarily be curbed. The union between artistic graphics and written commentary can be a welcome change to the columnar presentation of many current publications. We thus find this case to be analogous to *Hoffman*, and conclude that the Feature is entitled to full First Amendment protection.

Our conclusion is supported by the evidence in the record. It is undisputed that the cigarette company had no role in the design of the Feature itself. A declaration from Will Dana, Rolling Stone's managing editor, states that R.J. Reynolds had no input into the content, design or look of the Feature, and did not review or approve it. Mr. Dana's declaration further explains that, consistent with industry practice, Rolling Stone maintains a "wall" between its editorial and advertising staff to ensure "that there is no advertiser influence or pressure on editorial independence." He verified that the Feature was created by graphic artist Benjamin Marra and the magazine's editorial staff, who, at the time, were unaware that R.J. Reynolds had even bought the surrounding advertising space. Mr. Dana further stated that with respect to editorial gatefolds, "the advertiser may generally know the general topic of the gatefold (for example, that the gatefold will be about rock and roll trivia), but not specific content."

A declaration by Gary Armstrong, Rolling Stone's chief marketing officer, further supports the existence of a "wall" between editorial and marketing staff. He contrasts the format utilized by the Feature and other butterfly gatefolds with that of so-called "advertorials," which are advertisements that mimic a magazine's editorial characteristics, but that are prepared solely by the advertiser and are not listed in the magazine's table of contents. The publisher of Rolling Stone, Ray Chelstowski, submitted a declaration stating that R.J. Reynolds was informed that the gatefold editorial feature would be about "indie rock," but the specific content of the feature was not disclosed, nor was R.J. Reynolds involved in the development of the content. R.J. Reynolds did not pay defendants for advertising beyond the four pages that it designed itself. There was no evidence that, prior to publication, anyone at

Rolling Stone or R.J. Reynolds had any concerns that the advertisement and the Feature would be perceived as an integrated whole.[21]

Simply put, there is no legal precedent for converting noncommercial speech into commercial speech merely based on its proximity to the latter. There is also no precedent for converting a noncommercial speaker into a commercial speaker in the absence of any direct interest in the product or service being sold. We thus conclude that the Feature is noncommercial speech.

## C. *No evidence of actual malice*

"In many right of publicity cases, the question of actual malice does not arise, because the challenged use of the celebrity's identity occurs in an advertisement that 'does no more than propose a commercial transaction' and is clearly commercial speech. [Citations.] In all these cases, the defendant used an aspect of the celebrity's identity entirely and directly for the purpose of selling a product. Such uses do not implicate the First Amendment's protection of expressions of editorial opinion." (*Hoffman, supra*, 255 F.3d 1180, 1185.)

In the present case, the First Amendment applies to the Feature and, as a result, plaintiffs were required to provide clear and convincing evidence that defendants had acted with actual malice. The only evidence presented on this point are the declarations submitted by defendants, which we have described above. The declarations reveal, at best, that R.J. Reynolds was made aware of the topic that would be covered in the Feature and designed the surrounding advertisement to complement this topic. Beyond this limited shared knowledge, there was no evidence of any intentional collusion to misappropriate plaintiffs' identities.[22] At best, the evidence raises a triable

---

[21] In contrast, see *Solano v. Playgirl, Inc.* (9th Cir. 2002) 292 F.3d 1078, 1086 (magazine editors were aware of the cover's misleading potential but "wanted to 'sex up' the magazine to imply nudity [and] promote magazine sales," creating an issue as to whether the editors knowingly or recklessly published a misleading cover implying that the magazine contained a nude picture of the plaintiff); *Kaelin v. Globe Communications Corp.* (9th Cir. 1998) 162 F.3d 1036, 1042 (actual malice inferable from editor's mild concern about ambiguous headline, undisputed absence of belief that the plaintiff was a murder suspect and pecuniary motive to sell papers); and *Eastwood v. National Enquirer, Inc.* (9th Cir. 1997) 123 F.3d 1249, 1256 (finding from totality of editors' choices that they intended to convey impression, known to be false, that the plaintiff willfully submitted to interview by Enquirer).

[22] We have granted judicial notice of the April 20, 2009 order of the Superior Court, County of San Diego (*Coordination Proceeding Tobacco Litigation*, JCCP No. 4041), concerning the issue of whether, in the November 15, 2007 issue of Rolling Stone, R.J. Reynolds had violated the master settlement agreement prohibiting it from using cartoons in its advertising. The court found the California Attorney General "failed to prove that Reynolds intended that its ads surround [Mr. Marra's] cartoons or be adjacent to cartoons and failed to prove that Reynolds

issue only with respect to whether defendants were negligent in publishing the gatefold, as it is undisputed that the magazine's editorial staff played no part in designing the Camel ad and R.J. Reynolds's staff had no role in designing the Feature. Arguably, defendants could have done more "to ensure that [the Feature] and the Camel advertisement were sufficiently distinct." (See *Hoffman, supra,* 255 F.3d 1180, 1187.) However, "Mere negligence is not enough to demonstrate actual malice. [Citation.] '[S]ubjective or actual intent is required and . . . "there is no actual malice where journalists unknowingly mislead the public." ' [Citation.]" (*Ibid.*) Accordingly, plaintiffs cannot surmount the defense raised by defendants and the misappropriation claims are subject to dismissal under section 425.16.

Plaintiffs' UCL claim also fails because they have not demonstrated they "suffered injury in fact and [have] lost money or property as a result of the unfair competition." The only injury alleged by plaintiffs is one based on damage to reputation occurring as a result of the misappropriation of their identities. As we have concluded no actionable misappropriation occurred, plaintiffs cannot show a reasonable probability of prevailing on the merits on their UCL claim.

## D. *Freedom of the press*

In addition to the right to freedom of speech, defendants assert their constitutional right guaranteeing freedom of the press. We agree that this right also serves as a bar to plaintiffs' causes of action.

It is well established that "The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can

had any advance knowledge that its ad would be positioned next to or intertwined with cartoons." We also grant plaintiffs' request for judicial notice (filed Aug. 28, 2009) in a similar case brought in Pennsylvania (*Commonwealth of Pennsylvania v. Philip Morris, Inc.* (May 12, 2009, Philadelphia Co., Pa.C.P.Ct. No. 2443)), wherein the court found "Camel's the Farm advertisement pages envelope, integrate and cross-pollinate the undisputed cartoons in the 'editorial content' of Rolling Stone's Indie Rock Universe pages so completely as to constitute a single integrated whole." We note, however, that while court records may be the subject of judicial notice under Evidence Code section 452, subdivision (d), we "may take judicial notice of a court's action, but may not use it to prove the truth of the facts found and recited." (*O'Neill v. Novartis Consumer Health, Inc.* (2007) 147 Cal.App.4th 1388, 1405 [55 Cal.Rptr.3d 551].) We also note defendants were not parties to either of these actions. (See also *State of Maine, ex rel., G. Steven Rowe v. R.J. Reynolds Tobacco Co.* (Me.Super.Ct., Jan. 9, 2009, No. CV-97-134) 2009 Me. Super. Lexis 18 [concluding, similar to the San Diego decision, that R.J. Reynolds did not violate a consent decree concerning the use of cartoons in advertising].)

be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time." (*Miami Herald Publishing Co. v. Tornillo* (1974) 418 U.S. 241, 258 [41 L.Ed.2d 730, 94 S.Ct. 2831].) "[T]he courts have long held that the right to control the content of a privately published newspaper rests entirely with the newspaper's publisher. The First Amendment protects the newspaper itself, and grants *it* a virtually unfettered right to choose what to print and what not to." (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1391 [88 Cal.Rptr.2d 802].)

This right has been extended to the content and placement of advertisements. In a case involving an advertisement for a "professional mercenary" who subsequently committed a murder for hire, the Eleventh Circuit Court of Appeals recognized that "if state tort law places too heavy a burden on publishers with respect to the advertisements they print, the fear of liability might impermissibly impose a form of self-censorship on publishers." (*Braun v. Soldier of Fortune Magazine, Inc.* (11th Cir. 1992) 968 F.2d 1110, 1117.) The court held that the First Amendment "permits a state to impose upon a publisher liability for compensatory damages for negligently publishing a commercial advertisement where the ad on its face, and without the need for investigation, makes it apparent that there is a substantial danger of harm to the public." (*Braun, supra*, at p. 1119, fn. omitted.)

Here, the trial court faulted defendants for (1) selling advertising "that would enclose [the Feature]," (2) permitting R.J. Reynolds "to design the Camel advertisement to integrate with a feature about 'indie rock,' " (3) failing to expressly or implicitly identify the Feature as a Rolling Stone feature, and (4) failing to "check to ensure that Indie Rock Universe and the Camel advertisement were sufficiently distinct." The cases concerning freedom of the press suggest that even if the court's conclusions are correct, defendants' conduct is privileged under the constitutional guarantee of freedom of the press.

We also note that the November 15, 2007 issue of Rolling Stone magazine is replete with full-page advertisements, many of which appear to target the magazine's readership. These ads are primarily for alcoholic beverages, automobiles, personal grooming devices, fashion items, and cellular telephones. Out of the magazine's 215 pages, including the cover pages, no fewer than 108 pages are devoted to full-page advertisements, including several multipage ads. Thus, all of the editorial content of the magazine is, in a sense, "embedded" with advertising. It is true that the gatefold layout may intensify the readers' exposure to the ads because the pages run more or less contiguously and because the format requires readers to lift the advertising pages to the left and to the right, instead of just mindlessly turning them. But we see no principled legal distinction between a page of editorial content that

is preceded and followed by full-page ads, and the gatefold format, in which the ads appear only on the reverse side of a feature's pages.

In closing, we appreciate that the placement of the Feature within the gatefold layout may have caused plaintiffs some distress, insofar as their bands' names appeared in such close proximity to R.J. Reynolds's expressions of corporate sponsorship for independent music. Doubtless, Dustin Hoffman experienced similar distress upon seeing the image that was the subject of his lawsuit against Los Angeles magazine. Because plaintiffs have not demonstrated that defendants acted with actual malice, however, constitutional principles of freedom of speech and the press require this lawsuit be dismissed.

## DISPOSITION

The order is reversed.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied February 24, 2010, and the opinion was modified to read as printed above.

SPECIAL FOLDOUT INSIDE >>>

ILLUSTRATIONS BY BENJAMIN MARRA

RSHIP
ROBICIZE

Set the controls for the heart of the solar dance floor
**Simian Mobile Disco**
**Klaxons ◆ Justice**
**Daft Punk**
**Shitdisco**
**New Young Pony Club**
**Hot Chip**

ANCESTRAL PLANETS

The big beasts
**Nirvana ◆ Pixies**
**The Smiths ◆ Pulp**
**Guided by Voices**
**Neutral Milk Hotel**
**Sleater-Kinney**
**Joy Division**
**Pavement**
**Hüsker Dü**
**PJ Harvey**
**The Cure**

Planet Twee

The outer limits of kitten preciousness
**Vampire Weekend**
**Of Montreal**
**The Go! Team**
**Cocorosie ◆ Feist**
**Architecture in Helsinki**
**Antony and the Johnsons**

LOST IN BASS

Galactic funk, looking for the mothership connection
**LCD Soundsystem**
**Prinzhorn Dance School**
**The Rapture ◆ CSS**
**Bonde do Rolê ◆ !!!**

EAST ACCORDIONICA

Ringo's not the only one who's got a squeezebox
**Beirut ◆ DeVotchKa**
**Gogol Bordello**
**The World/Inferno Friendship Society**

SECOND BLACK HOLE

The first cut is the deepest but better luck next time
**Bloc Party**
**Kaiser Chiefs**
**The Thrills ◆ The Stills**
**The Futureheads**
**Clap Your Hands Say Yeah**

AMBIENT LOUD

Synthesized space dust, to tune with the celestial hum
**Matmos ◆ Múm**
**Fields ◆ Psapp**
**Boards of Canada**
**Junior Boys**

SURGEON GENERAL'S WARNING: Quitting Smoking Now Greatly Reduces Serious Risks to Your Health.