Filed 7/30/20; certified for publication 8/7/20 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| LIN JOON OH et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA et al., <br><br> Defendants and Respondents. | B297567 <br><br> (Los Angeles County Super. Ct. No. BC629958) |

APPEAL from judgments of the Superior Court of Los Angeles County.  John A. Torribio, Judge.  Affirmed.

Felahy Employment Lawyers, Allen Felahy; Yash Law Group and Yashdeep Singh for Plaintiffs and Appellants.

Cozen O'Connor and Nathan Dooley for Defendant and Respondent Teachers Insurance and Annuity Association of America.

Lynberg & Watkins, Michael J. Larin and Jerome P. Doctors for Defendants and Respondents Cushman & Wakefield Management Corporation, Cushman & Wakefield of California, Inc., and JRT Realty Group, Inc.

—————————————

# SUMMARY

Plaintiffs Lin Joon Oh and Jung Hee Oh are the parents of Ji Hoon Oh, who died when a hair care product he was handling exploded and he was engulfed in the resulting fire. His employer did not know the product was dangerous, and so did not comply with legal requirements for storing and labeling hazardous materials, or with provisions in the lease of the premises where the fire occurred.

Plaintiffs sued the owner and lessor of the premises (Teachers Insurance and Annuity Association of America or TIAA) and the companies that managed the property for TIAA (Cushman & Wakefield Management Corporation, doing business as Cushman & Wakefield Management Company; Cushman & Wakefield of California, Inc.; and JRT Realty Group, Inc., collectively C&W). Plaintiffs claimed defendants had a duty to maintain and inspect the area where the employer stored the product, to ensure the area was safe and in compliance with state and local ordinances, and should have discovered the product was hazardous.

The trial court granted motions by defendants for summary judgment. The court concluded defendants had no duty of care to the decedent. This was because defendants had no knowledge of the dangerousness of the product, which was stored in drums that did not disclose it was hazardous, and was stored in an area leased to the employer, not in a common area.

We agree there was no evidence defendants had actual or constructive knowledge the employer was storing and handling a hazardous material, and defendants therefore owed no duty to the decedent. We affirm the judgment.

## FACTS

### 1. The Background

The decedent worked for I.B.S. Beauty, Inc. (IBS or tenant), a company wholly owned by its chief executive officer, Daniel Kim. IBS is a small company that distributes hair care products. IBS operated its warehousing and distribution business from a portion of a building on Pioneer Boulevard in Santa Fe Springs, part of an industrial complex. IBS leased the premises from defendant TIAA in October 2007, and renewed the lease several times, including by a third amendment in October 2015.

On March 7, 2016, decedent was dispensing a hair care product IBS sold as "MOA oil" from a 55-gallon drum to smaller containers when the drum exploded, and fire engulfed decedent and the premises. An investigation after the fire revealed that the hair oil in the drum was highly flammable and volatile, with a flashpoint of only 18 degrees Fahrenheit. IBS's owner, Mr. Kim, had no idea the hair oil was hazardous or highly flammable until after the fire.

Plaintiffs sued TIAA and C&W, among others.[1] Their operative third amended complaint alleged causes of action for negligence per se, wrongful death, and a survival action. After several demurrers and rulings we need not recount, defendants moved for summary judgment. They contended they owed no duty to the decedent because they had no knowledge of the

---

[1] TIAA cross-complained against Daniel Kim, and the trial court granted TIAA's unopposed motion for summary adjudication on its cause of action for negligence against Mr. Kim.

3

hazard, and that plaintiffs' claim to the contrary relied on a misinterpretation of the lease agreement.

**2.    The Evidence**

The evidence included matters concerning the tenant's (Mr. Kim's) lack of knowledge of the dangerous nature of the MOA hair oil; the lease provisions prohibiting hazardous materials on the premises without the owner's consent; the lease provisions describing the premises; and whether defendants were on notice that a hazardous material was kept on tenant's premises.  In reviewing this evidence, it may be helpful to bear in mind plaintiffs' central contentions, for which the trial court found there was no supporting evidence:  that IBS stored the hazardous hair oil in a common area that was not a part of the leased premises, but rather an area defendants controlled and were obligated to inspect and maintain, and further that defendants' property manager saw the drums containing the hair oil and should have investigated and discovered it was hazardous.

**a.    Actual knowledge of the danger**

As mentioned, IBS's owner, Mr. Kim, had no idea the hair oil was hazardous or highly flammable until after the fire, and (accordingly) he never told anyone else that the MOA oil was highly flammable.  He repeatedly testified to the same effect, for example, that "I didn't think it was dangerous," and "I thought it was safe," and he never told anyone he was handling flammable materials, and that was because he "didn't realize that the materials were at all flammable, explosive, or volatile."[2]  On an

---

[2]    Mr. Kim's testimony is uncontroverted.  Nevertheless, plaintiffs purport to dispute it by saying it was common

4

earlier occasion, Mr. Kim himself had transferred MOA oil from one of the drums to smaller containers.

### b.    Lease provisions:  hazardous materials

The lease defined hazardous materials, and prohibited tenant from storing or using such materials on the premises without prior written consent.  Mr. Kim signed an environmental questionnaire and disclosure statement (Exhibit D to the lease), stating that no hazardous materials—no wastes and no chemical products—would be used or stored on site.  The lease required tenant to immediately notify the landlord "of any and all changes" occurring after tenant's delivery of the completed environmental questionnaire.  The lease also made the tenant responsible for complying with any and all applicable laws, regulations or ordinances pertaining to hazardous materials "which impose any duty upon Landlord or Tenant directly or with respect to the use or occupation of the Premises."  In the third

---

knowledge that the MOA oil "was dangerous and hazardous." They cite testimony from Sammy Lee, Mr. Kim's uncle.  Mr. Lee worked as a consultant for IBS "on a lot of aspects of the business regarding sales, distributors, representation, a lot of design work, photography, marketing."  He testified that "everybody knows that oils are flammable whether it be motor oil or cooking oil, oils are all flammable therefore it is just common sense."  He did *not* testify that MOA oil was dangerous or hazardous—quite the contrary.  He saw no reason to tell customers that hair oils are flammable; some of the labels on competitors' products stated they were flammable but the majority did not.  "I assumed that it was common sense that it is flammable so therefore don't use it near open flames."  This testimony does not create a material dispute.

5

amendment to the lease, in effect at the time of the fire, the tenant reaffirmed and warranted that as of the date of the amendment, the representations contained in the environmental questionnaire and disclosure statement "attached to the Lease as Exhibit D" were true and accurate, and that tenant was in compliance with all applicable laws.

### c.    Lease provisions:  the premises

The "basic lease provisions" (art. I) described the premises as:  "That portion of that certain free standing Building located at 10015 S. Pioneer Boulevard, Santa Fe Springs, California  90670, consisting of approximately 5,025 square feet, as further described on Exhibit A attached hereto."  Similarly, article II of the lease defined " 'Premises' " as "the premises described in [the basic lease provisions] as further shown on Exhibit A for the exclusive use of Tenant."

Exhibit A was entitled "Description of Premises" and contained an illustration of the premises showing both the building and an adjacent "Fenced Area."  A copy of Exhibit A is attached at the end of this opinion.  Exhibit A stated it was "intended only to show the general layout/location of the Premises as of the beginning of the Term of this Lease," was "intended for illustrative purposes only" and was not to scale.[3]

---

[3]     Plaintiffs assert that in the third amendment to the lease (in effect at the time of the fire) "no reference was made to an exhibit or other drawing or depiction describing the premises." This is irrelevant because the third amendment did not change the definition of the premises, and it incorporated the original lease, also specifying that all capitalized terms defined in the lease had the same meaning in the amendment.

6

Mr. Kim testified that Exhibit A was "a fair representation of the premises that [he] had leased." At his deposition, he also drew a diagram of the leased premises and the neighboring property, showing the fenced area and explaining that there was a roll-up chain door they could open during the day for trucks to come in and out, and "you just close it before you go home," and "we had a lock on there." (The parties sometimes refer to the fenced area as the "fenced yard.")

The lease defined " 'Outside Areas' " as "the areas of the Project [the industrial complex] outside the exterior walls of the Premises, including, without limitation, the roof of the Premises, commonly referred to as common areas." The landlord was responsible for maintaining the outside areas, "including but not limited to, landscaping (including replacement thereof), sprinkler systems, walkways, parking areas, and approved signage."

### d. Evidence about the 55-gallon drums

Plaintiffs' opposition papers contended the evidence showed defendants' senior property manager, Heather Montrone, observed multiple light-blue 55-gallon drums in the fenced yard prior to the fire, with labels identifying the contents as "KF-9008." According to plaintiffs, this put defendants on notice that the substance in those drums was a hazardous material, yet Ms. Montrone took no steps to remove them or investigate their contents. The actual evidence about the drums was as follows.

In September 2015, Mr. Kim received, from a new supplier in South Korea, three light-blue, metal, 55-gallon drums containing the MOA hair oil. He had changed suppliers to reduce costs, and had never before ordered or received MOA oil in a 55-gallon drum. The three drums were marked "Made in Japan" and "KF-9008." (Mr. Kim was concerned about the "Made in

7

Japan" label, and testified the Korean supplier assured him the drums contained his MOA oil, and the supplier had reused drums that previously contained something else.)

At the time of the explosion, two of the three light-blue metal drums were inside the building. The decedent was dispensing the MOA oil from one of them. The third, empty drum was in the fenced yard, and had been there for one or two months. (Mr. Kim testified that "we just never got around to [discarding] it," and "just left it out there because it's our space that we can utilize.")

Christopher Gardea, a fire inspector who investigated the fire, found all three drums on the premises. He too testified the drum out in the yard was empty. He did not recall seeing a hazardous materials placard or warning anywhere on that drum. He could not say whether the three drums were all identically labeled, because some of the labeling (on the two drums that were inside the building) was destroyed in the fire. The empty drum in the fenced area was labeled "KF-9008," but tests of the substance in the drum that remained intact inside the warehouse showed it had a flash point of 18 degrees Fahrenheit, much lower than the flash point for KF-9008 (according to Mr. Gardea, 170 degrees Fahrenheit).[4]

There is a photograph in the record (an exhibit to Mr. Kim's deposition) that shows the fenced yard, with 11 drums in it. Mr. Kim testified that he had received 55-gallon dark-blue plastic drums in the past, but could not remember when, or from what

---

[4]     Under section 202 of the California Fire Code, liquids with a flash point below 73 degrees Fahrenheit are categorized as Class I flammable liquids. (Cal. Code Regs., tit. 24, pt. 9, § 202.)

manufacturer. (Those dark-blue plastic drums are not at issue in this case; the MOA oil came in three light-blue metal drums.) There is no evidence there was ever any drum containing MOA oil stored in the fenced yard—only the one empty drum.

Ms. Montrone was responsible for oversight and management of properties in the industrial complex, including the leased premises. She or another staff member inspected the common areas by way of a "landscape walk" on a quarterly basis.

When questioned about looking to see what was inside the fenced yard, Ms. Montrone said that "I don't remember specifically looking in to see what was in there, but I am sure that I've walked by and seen stuff that was inside." She said, "They would have pallets, the blue plastic drum I've seen. That's really all I can recall. I do this with so many tenants. I don't remember specifically." When asked if she remembered "seeing the blue plastic drums prior to the fire," she replied, "Correct."[5]

---

[5] At Ms. Montrone's second deposition, on April 23, 2018 (taken in her capacity as defendants' person most knowledgeable), plaintiffs' counsel drew Ms. Montrone's attention to her previous testimony that she remembered seeing "the blue plastic drums" prior to the fire. Counsel then showed her the photograph of the fenced area (mentioned in the text, *ante*) that shows the fenced area with 11 drums in it. Counsel asked Ms. Montrone if "that [is] what you were referencing when you testified that way, these particular drums in this picture?" She replied, "[n]ot in this picture but similar drums." Counsel asked how many drums she saw, and Ms. Montrone said, "I don't know." She further stated, "I may have seen one. These are behind the fence, and if I was driving by, I would not have stopped to count how many drums there were." Counsel asked, "You saw more than one; is that correct?" Ms. Montrone

9

Counsel asked, "[A]fter seeing those blue drums in that yard, did you ever ask the tenant what those were?" and Ms. Montrone said, "No." This was because "[t]hey were unmarked, and a large number of our tenants use them for a variety of reasons," such as water storage. Counsel asked Ms. Montrone if she was "concerned that there were products being stored in the outside area that might, in fact, be hazardous?" She replied, "No," and that she took no steps to find out what was being stored in the outside area. She testified that she "didn't need to know what was in the drums."

3.    The Trial Court's Decision

The court granted defendants' motions for summary judgment. The court found defendants provided "ample evidence of lack of knowledge that the drums contained hazardous materials"; it was "uncontroverted that the subject barrel was mismarked and did not in any way disclose its dangerousness"; and that "a fair reading of the lease clearly shows that the fenced in area belongs to [the tenant]." The court also concluded that a landlord is not liable for a tenant's violation of an ordinance, so plaintiffs' claim of negligence per se had no merit.

The trial court entered judgments for defendants, and plaintiffs filed timely notices of appeal.

---

answered, "I don't recall." She said, "I remember seeing a drum. I don't know how many." When pressed to make an estimate, she said, "I would say one." There was only one "[t]hat I distinctly remember seeing." She remembered it because "[i]t was near the opening of the fence; so I happened to see it going by the building."

10

## DISCUSSION

We agree with the trial court that the evidence shows no triable issue of material fact, and defendants were entitled to summary judgment.

### 1.     Appellate Motions

Two motions were filed during appellate briefing.

First, on March 25, 2020, defendants filed a motion to augment the record with six volumes of documents, consisting of a petition for writ of mandate with accompanying exhibits, filed (and denied) earlier in the litigation.  These documents are in the trial record, but not all are in the appellate record.  Defendants say that in the first two pages of their opening brief, plaintiffs improperly refer to matters that are not in the appellate record, inaccurately characterizing several of the trial court's demurrer rulings.  Defendants further argue plaintiffs made allegations in earlier versions of the operative complaint that were omitted or altered in the operative complaint, and that these are judicial admissions (for example, allegations to the effect that the drums were not labeled as hazardous, and that safety data sheets supplied with the MOA oil were false).  These claimed admissions, defendants say, support their arguments and undermine arguments plaintiffs make in their opening brief.

We deny the request to augment the record.  The demurrer pleadings and rulings are not relevant to this appeal.  The only record we require is the record of the summary judgment proceedings, and the court is able to distinguish legal and factual mischaracterizations when they are present.  The record we have sufficiently demonstrates the absence of material factual disputes.

11

Second, on June 17, 2020, defendants filed a motion to strike portions of plaintiffs' reply brief. In that brief, plaintiffs attached as an exhibit a page from the transcript of Ms. Montrone's deposition testimony, stating it had been omitted from the appellate record. In fact, plaintiffs were mistaken; that page of testimony is in the appellate record, twice, and has been reviewed in normal course. We deny the request to strike the exhibit from the record.

Defendants also ask us to strike plaintiffs' references to the declaration of Daniel Kim, on pages 15 through 16 of plaintiffs' reply brief. We grant this request because Mr. Kim's declaration was not part of the record before the trial court.

The following summary of the background of the declaration of Daniel Kim explains why we grant defendants' request to strike it from the record of this appeal. TIAA separately moved for summary adjudication of its cross-complaint for negligence against Mr. Kim (see fn. 1, *ante*). That motion was to be heard on the same dates as the motions against plaintiffs. Mr. Kim did not oppose TIAA's motion, and TIAA duly filed a notice of nonopposition. Then, on September 7, 2018 (two weeks after the first of the two hearings on the motions now under review), Mr. Kim filed a motion for leave to file an opposition, including his own proposed declaration. The declaration stated, among other things, Mr. Kim's understanding that IBS was leasing only the building, not the fenced area. Mr. Kim's motion to file a late opposition and ensuing ex parte motions were denied.

Meanwhile, on September 10, 2018, plaintiffs filed a supplemental request for judicial notice of Mr. Kim's declaration, as a record of the court (Evid. Code, § 452, subd. (d)). In its

12

summary judgment ruling, the court granted all parties' requests for judicial notice "as to the existence of the documents, but not as to any hearsay statements contained therein."

Under these circumstances, we cannot consider the content of Mr. Kim's declaration. The trial court never granted Mr. Kim permission to file any opposition to TIAA's motion, specifically denying Mr. Kim's motions, and expressly granting TIAA's motion as "unopposed." That necessarily means the declaration was not part of the evidence on TIAA's motion for summary adjudication against Mr. Kim. Still less can it serve as evidence in opposition to the entirely separate motions now under review.

The trial court's judicial notice that the declaration exists gets plaintiffs nowhere. "While we may take judicial notice of court records . . . , the truth of matters asserted in such documents is not subject to judicial notice." (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482; see also *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 689, fn. 22 ["[W]hile court records may be the subject of judicial notice under Evidence Code section 452, subdivision (d), we 'may take judicial notice of a court's action, but may not use it to prove the truth of the facts found and recited.' "].) In short, Mr. Kim's declaration was not a part of the evidence before the trial court, and for that reason, we grant defendants' motion to strike plaintiffs' references to that declaration.

2.      **The Standard of Review**

A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).) Summary judgment is appropriate where "all the papers submitted show

13

that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Id.,* subd. (c).)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' " (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.)  It is no longer called a "disfavored" remedy.  (*Ibid.*) "Summary judgment is now seen as 'a particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." (*Ibid.*)  On appeal, "we take the facts from the record that was before the trial court . . . . ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' " (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037, citation omitted.)

**3.    Contentions and Conclusions**

    **a.    The procedural claim**

Plaintiffs' first argument is that we cannot consider TIAA's motion for summary adjudication of the wrongful death and survival causes of action.  They say TIAA's separate statement did not comply with California Rules of Court, rule 3.1350(b) and (d)(1), because it did not separately identify each cause of action and each material fact supporting that cause of action.  The wrongful death and survival claims are derivative of the negligence claim, and cannot succeed if plaintiffs' negligence claim is dismissed, because all three causes of action rest on the same facts.  Plaintiffs insist that failure to comply with the separate statement rules is a sufficient ground for denying TIAA's motion, citing Code of Civil Procedure section 437c,

14

subdivision (b)(1).  They omit to recite that it is a sufficient ground "in the court's discretion."  (*Ibid*.)  It would be an abuse of our discretion to refuse to review the grant of summary adjudication of the wrongful death and survival causes of action in this case.

      **b.**     **The negligence per se claim**

Plaintiffs' second argument is that under the negligence per se doctrine, negligence is presumed if the defendant violated a statute or regulation, injury resulted from an occurrence the regulation was designed to prevent, and the injured person was among those the regulation was adopted to protect.  They cite authority that whether a person has violated a statute or regulation is a question of fact (*Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 263-264).  So far, so good, but then plaintiffs tell us there is "overwhelming evidence" that defendants violated numerous fire safety regulations and ordinances.  In fact, there is none.

Plaintiffs assert defendants violated Fire Code provisions that require an operational permit "[t]o store, handle or use Class I liquids," and "to store, transport on site, dispense, use or handle hazardous materials," in excess of certain amounts.  As is apparent from our fact recitation, there is no evidence defendants did any of those things.[6]  Nor is there any evidence that

---

[6]     The two permit requirements appear in the 2013 edition of the California Fire Code (in effect at the time of the fire), then-sections 105.6.16 and 105.6.20 of part 9 of title 24 of the California Code of Regulations.  (Title 24 is also referred to as the California Building Standards Code; part 9 is the Fire Code.)  Plaintiffs also say defendants violated two other Fire Code provisions requiring a permit application to contain certain forms

defendants knew IBS was storing and using hazardous materials. The evidence is undisputed that before the fire, even Mr. Kim did not know that he had brought hazardous materials on the premises, so he could not have conveyed that information to defendants.

Undeterred by the absence of facts to support the asserted Fire Code violations, plaintiffs tell us the permit requirements have no "scienter requirement" and that ignorance of the law requiring a permit is no excuse. Obviously, the pertinent point is that defendants did not know the *facts*—that IBS was storing hazardous materials—not that defendants did not know the law. Plaintiffs offer no authority to support their apparent position that owners are strictly liable for what their lessees do.[7]

---

with specified information (§§ 407.5 & 5001.5.2), and another that states safety data sheets shall be readily available on the premises for hazardous materials (§ 5003.4). These regulations are even further afield.

[7] Plaintiffs cite *Grant v. Hipsher* (1967) 257 Cal.App.2d 375 for the proposition that liability for a violation of the Fire Code can be imposed on defendants even though they were not in possession of the premises. That is not the issue here, where defendants were unaware of the hazardous materials. In *Grant*, a county ordinance required premises with a swimming pool to be fenced with self-closing and self-latching access gates. The tenant, with the lessor's knowledge and using lessor-provided materials, installed a fence with a gate that was not self-closing and self-latching, and a neighbor's child died in the pool. (*Id.* at pp. 377-379.) The court applied the principle that "where a tenant makes a structural change which is in violation of safety regulations and the owner has knowledge of the change, a duty is imposed upon the owner to terminate the tenancy or compel the

16

Plaintiffs then insist that defendants violated section 109.2 of the 2013 Fire Code. That section (now section 110.2) makes the owner responsible for correction and abatement of violations of the code. It further provides that if an occupant "creates, or allows to be created, hazardous conditions in violation of this code, the occupant shall be held responsible for the abatement of such hazardous conditions." Section 109.2 followed section 109.1 ("[u]nlawful acts")—the code provision that makes conduct in violation of the code unlawful. Section 109.1 (now section 110.1) makes it unlawful "for a person, firm or corporation to . . . utilize a building, occupancy, [or] premises . . . regulated by this code, or cause same to be done, in conflict with or in violation of any of the provisions of this code."[8]

It was not defendants who utilized the premises in violation of the Fire Code, or caused that to be done—it was IBS.

In any event, it does not matter whether Fire Code former section 109.2 made both owner and occupant responsible for abatement. Responsibility for correcting and abating a violation of the code is not the same thing as creating the hazardous condition that violates the code. It seems clear that a property owner may be responsible for correcting and abating violations of

_____

tenant to comply with the regulations." (*Id.* at p. 381.) The circumstances here are in no way comparable.

[8]    Section 109.1 of the 2013 Fire Code stated, in its entirety: "It shall be unlawful for a person, firm or corporation to erect, construct, alter, repair, remove, demolish or utilize a building, occupancy, premises or system regulated by this code, or cause same to be done, in conflict with or in violation of any of the provisions of this code."

17

the code, once notified of the violation (see section 109.3, now section 110.3), or if the owner is otherwise aware of the violation. But we know of no authority for the proposition that an owner violates section 109.2 of the Fire Code—requiring it to correct violations—if it does not correct a code violation it did not commit and does not know, or have reason to know, existed. (We discuss and reject plaintiffs' assertion there was evidence defendants should have known of the presence of hazardous materials, *post*.) Nor do plaintiffs point to any such authority.

In short, plaintiffs have offered no evidence of a statutory or regulatory violation by defendants, so there is no basis for their negligence per se claim.

### c.     The claims of control and knowledge

Plaintiffs' third argument is that, even without the negligence per se doctrine, defendants as property owners owed a duty to use ordinary care to prevent injury to the decedent, as an employee of the tenant. This argument is founded on claims that the fenced yard was a common area that defendants were responsible for inspecting and maintaining, and on purported evidence that defendants knew IBS was storing and handling hazardous materials. Neither argument has merit.

### i.     The control claim:  the fenced area

Interpretation of a contract is "solely a judicial function . . . unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)  "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting" (Civ. Code, § 1636), and terms may be explained by course of performance (Code Civ. Proc., § 1856, subd. (c)).

18

We refer the reader to our description of the lease provisions in part 2.c. of the facts, *ante* at pages 6 through 7. We will not repeat that recitation here, except as necessary to express our agreement with the trial court's construction of the lease, namely, that the leased premises included the fenced area shown on Exhibit A to the lease. The premises were defined as that portion of a building consisting of 5,025 square feet, "as further shown on <u>Exhibit A</u> for the exclusive use of Tenant." Exhibit A states it was intended for illustrative purposes only, and it serves that purpose well—it clearly illustrates both the building and the fenced area. We see no other reasonable interpretation of the lease, the provisions of which we construe as a whole, not in isolation.

To the extent there is any ambiguity in the lease—such as by virtue of the lease's definition of "outside areas" (common areas) that defendants controlled—the intention of the parties on the point is clear from Mr. Kim's testimony that Exhibit A was "a fair representation of the premises that [he] had leased." And, both parties conducted themselves in accordance with that intention. Mr. Kim locked up the area after the close of business, and Ms. Montrone testified that, on her quarterly landscape walks, "[w]e do not go in the fenced yard," even if the fence is open, and that the fenced-off yard was "for tenant use only, and that's how we operate."

Plaintiffs insist that Ms. Montrone "admitted in deposition" that the fenced area was an "outside area" and therefore defendants were responsible for maintaining it. That is arguably inconsistent with the facts to which she testified, but her

19

testimony on a legal issue is irrelevant.[9]  The legal implications of language in a lease is for the court to decide, based on the document itself and admissible extrinsic evidence. Ms. Montrone's testimony to a legal conclusion has no significance.

## ii. The knowledge claim

Plaintiffs assert defendants had a duty to decedent because they knew the hazardous liquid was stored, handled and dispensed on their property.  To the contrary, there is no evidence defendants knew, and there is no evidence they should have known.

We have recited the evidence that Mr. Kim had no idea he was handling hazardous material at the premises (see pt. 2.a. of the facts, pp. 4-5 & fn. 2), and we will not repeat ourselves.  He could not have conveyed what he did not know to defendants.

That brings us to the claim defendants should have known of the danger, and "had an opportunity and the means to prevent the explosion."  That, too, is unsupported by the evidence.

---

[9]     Ms. Montrone was questioned in detail about the meaning of the lease provision defining "outside areas."  Then counsel asked, "And you understood that the landlord was responsible for maintaining that yard, because it was outside the four concrete walls; isn't that true?"  She answered (over counsel's objections), "My understanding is that we would maintain the asphalt or the fence if there were a problem with the fence, but nothing that is tenant property, you know, by the fence area."  Plaintiffs' counsel moved to strike that answer as nonresponsive, and Ms. Montrone then answered the same question, over the same objections, "Yes."

20

The evidence is clear there were only three light-blue metal drums containing the hazardous MOA oil. Only one of them was stored in the fenced area—an empty one. It was labeled "Made in Japan" and "KF-9008." There is no evidence it had any markings showing its contents were dangerous or hazardous. There is evidence Ms. Montrone might have seen this drum while walking past the fenced area, but there is no evidence she saw any of the labels on the drum. Indeed, she testified the drums she saw "were unmarked." Whether she saw that drum, or also saw multiple blue plastic drums (which, unlike the metal drums, did not contain MOA oil), she had no cause to think it or they posed any danger to anyone.

Even if it were permissible to infer Ms. Montrone saw the KF-9008 label on the empty blue metal drum in the fenced area, that label without more does not even hint at a possible danger, and cannot generate a duty to investigate to determine what "KF-9008" means. Plaintiffs tell us that a Google search of KF-9008 would have led to a company's website that identifies the two components of KF-9008, one of which is cyclopentasiloxane, which (plaintiffs tell us) is flammable. But the mismarked drum did not in any way disclose that KF-9008 was a flammable or dangerous substance and, as the trial court observed, "[t]his fact answers all other questions regarding duty and liability." The court concluded, and we agree, that there is no authority requiring a landlord to conduct research or otherwise investigate the contents of containers that present no indication of possible hazards.

Plaintiffs insist defendants had a right and a duty to inspect the premises at the time the lease was renewed in October 2015, when the three drums of MOA oil had already been

21

delivered to IBS. This gets plaintiffs nowhere either. "The obligation to inspect arises 'only if [the landowner] had some reason to know there was a need for such action.' " (*Garcia v. Holt* (2015) 242 Cal.App.4th 600, 605.) And, as we have seen, an inspection would have revealed nothing marked hazardous or dangerous. "The landlord need not take extraordinary measures or make unreasonable expenditures of time and money in trying to discover hazards unless the circumstances so warrant." (*Mora v. Baker Commodities, Inc.* (1989) 210 Cal.App.3d 771, 782.) There was no evidence of any such circumstances here.

In sum, there is no theory under which defendants owed a duty of care to decedent. The trial court properly entered summary judgment.

## DISPOSITION

The judgments are affirmed. Defendants shall recover their costs on appeal.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

STRATTON, J.

22

This Exhibit is intended only to show the general layout/location of the Premises as of the beginning of the Term of this Lease. It is intended for illustrative purposes only and is not to be scaled. Any measurements or distances shown should be taken as approximate and any physical condition indicated herein may not exist as shown.



Filed 8/7/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LIN JOON OH et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA et al.,<br><br>    Defendants and Respondents. | B297567<br><br>(Los Angeles County Super. Ct. No. BC629958)<br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION**<br><br>**[No change in judgment]** |

THE COURT:

    The opinion in the above-entitled matter filed on July 30, 2020, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

    There is no change in the judgment.

_____

BIGELOW, P. J.                 GRIMES, J.            STRATTON, J.